Megan E. Glor, OSB No. 930178
Email: megan@meganglor.com
John C. Shaw, OSB No. 065086
Email: john@meganglor.com
Megan E. Glor, Attorneys at Law, P.C.
707 NE Knott Street, Suite 101
Portland, OR 97212
Telephone: (503) 223-7400
Facsimile: (503) 751-2071

Attorneys for Plaintiff

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

### PORTLAND DIVISION

| | |
|---|---|
| **NATHAN DYKMAN,** | |
| **Plaintiff,** | **Case No. 3:20-cv-1547-IM** |
| **v.** | **Plaintiff's Motion for Judgment Pursuant to Fed. R. Civ. P. 52(a)** |
| **LIFE INSURANCE COMPANY OF NORTH AMERICA,** | ***Oral Argument Respectfully Requested*** |
| **Defendant.** | |

# TABLE OF CONTENTS

I.    LR 7-1(a) Certification .................................................................................. 1

II.   Plaintiff's Motion .......................................................................................... 1

III.  Introduction ................................................................................................... 1

IV.   Discussion ..................................................................................................... 2

    A.   Dykman Has Proved by a Preponderance of the Evidence that
        He is Disabled from His Regular Occupation as a Software
        Developer and from Any Occupation under the Terms of
        the LTD Plan ........................................................................................... 3

        1. Dykman Moves for Judgment Under ERISA,
           29 U.S.C. § 1132(a)(1)(B) ........................................................... 3

        2. The LTD Plan's Disability Provisions .................................................. 3

        3. The Applicable Standard of Review is *De Novo* .................................. 4

        4. The Medical Record Establishes Dykman's Disability ......................... 6

            a.   In 2011, Dykman was Diagnosed With
                Multiple Sclerosis by Neurologist and MS
                Specialist, Dr. Kyle Smoot ................................................... 6

            b.   Dykman has a History of Ocular Problems, Including
                Dry Eyes, which Began to Affect His Focus in 2017 .............. 7

            c.   By May 2018, Dykman Had Missed Some Work
                Due to Fatigue and Summer Heat Had Caused an
                Increase in His MS Symptoms ................................................ 7

            d.   Dykman Left Work on September 8, 2018 Due to
                Disability Resulting from Vision Problems and
                MS Symptoms ......................................................................... 8

            e.   The 2019 Medical Record Documents Ongoing
                MS Symptoms and Vision Problems ...................................... 10

            f.   Dykman's Treating Providers Confirmed Dykman
                is Disabled By Visual Problems and Symptoms of MS .......... 13

                1.   The Opinion by Neurologist Dr. Smoot,
                    Dykman's Treating MS Specialist, that Dykman
                    is Disabled is Fully Credible ...................................... 13

2. Three Other Treating Medical Providers
Confirmed Dykman was Disabled as the
Result of MS Symptoms ........................................................ 17

g. Dykman and His Mother Provided Observations
that Corroborate the Medical Record...................................... 18

B. LINA Erroneously Denied Dykman's Claim and Appeal, Relying
Upon File Reviews Prepared by Consultants Who Ignored and
Misstated the Record and the Nature of MS .................................... 19

1. Dr. Teitel Ignored and Misstated the Medical Record
and Failed to Consider the Nature of MS in Erroneously
Asserting Dykman was Not Disabled ................................... 20

2. Dr. Vosoghi's Error-Filled Review Ignores Material
Evidence of Disability from Visual Problems and MS and
Ignores the Nature of MS.................................................... 24

3. LINA Erroneously Relied upon Dr. Johnkutty's File Review
and Addendums in Denying Dykman's Appeal .................... 28

a. Dr. Johnkutty ignored substantial evidence of vision problems ............ 28

b. Dr. Johnkutty ignored substantial evidence of disability...................... 30

c. Dr. Johnkutty Ignored, Misstated and Dismissed Material
Evidence of Disability in Her Three Addendums.................................. 32

C. LINA Should Be Ordered to Approve and Pay Dykman's Disability Claim .................. 34

V. Conclusion ........................................................................................ 35

**TABLE OF AUTHORITIES**

## U.S. Supreme Court Cases

*Black & Decker Disability Plan v. Nord*, 538 U.S. 822 (2003)...............................................13

*Metropolitan Life Ins. Co. v. Glenn,* 554 U.S. 105 (2008) .........................................................3


## U.S. Court of Appeals Cases

*Abatie v. Alta Health & Life Ins. Co.*, 458 F.3d 955 (9th Cir. 2006) (en banc).........................5

*Grosz-Salomon v. Paul Revere Life Ins. Co.*, 237 F.3d 1154 (9th Cir. 2001) ...........................4

*Jebian v. Hewlett-Packard Co. Emp. Benefits Org. Income Protection Plan*,
349 F.3d 1098 (9th Cir. 2003) ...............................................................................................13

*Kearney v. Standard Ins. Co.*, 175 F.3d 1084 (9th Cir. 1999)(en banc).....................................4

*Kibel v. Aetna Life Ins. Co., 725 Fed. Appx. 475 (9th Cir. 2018)* ...........................................15

*Montour v. Hartford Life & Acc. Ins. Co.*, 588 F.3d 623 (9th Cir. 2009)................................20


## U.S. District Court Cases

*Coleman-Fire v. Standard Ins. Co.*, 2019 U.S. Dist. LEXIS 76726
(D. Or. May 7, 2019) .........................................................................................................5, 13

*Gallegos v. Prudential Ins. Co. of Am.,* 2017 U.S. Dist. LEXIS 86123
(N.D. Cal. June 5, 2017) ...........................................................................................23, 26, 29

*Gorena v. Aetna Life Ins. Co.,* 2018 U.S. Dist. LEXIS 104071
(W.D. Wash. June 15, 2018)................................................................................................19, 34

*Laurie v. United of Omaha Life Ins. Co.*, 2017 U.S. Dist. LEXIS 35430
(D. Or. Jan. 23, 2017) ........................................................................................................19, 31

*Petrusich v. Unum Life Ins. Co. of Am.*, 984 F. Supp. 2d 1112
(D. Or. 2013)...........................................................................................................................34

*Rabbat v. Standard Ins. Co.,* 894 F. Supp. 2d 1311, 1313 (D. Or. 2012)........................4, 5, 13

*Rios v. Unum Life Ins. Co.,* 2020 U.S. Dist. LEXIS 233953
(C.D. Cal. Dec. 10, 2020) .....................................................................................................34

*Stout v. Hartford Life & Accident Ins. Co.,* 58 F. Supp. 3d 1020
(N.D. Cal. 2013).....................................................................................................................20

## <u>Other Authorities</u>

29 U.S.C. § 1132(a) ............................................................................................................. 1, 3, 4

Fed.R.Civ.P. 52(a) .................................................................................................................... 1

USDC Oregon Local Rule 7-1(a) ............................................................................................. 1

WAC 284-50-321 ...................................................................................................................... 4

## I.  LR 7-1(a) CERTIFICATION

The undersigned certifies that the parties have made a good faith effort through telephone

conferences and correspondence to resolve this dispute, but have been unable to do so.

## II.  PLAINTIFF'S MOTION

This action is brought pursuant to § 502(a) of the Employee Retirement Income Security

Act of 1974 ("ERISA"), 29 U.S.C. § 1132(a). Plaintiff Nathan Dykman hereby moves pursuant

to Fed.R.Civ.P. 52(a) for a judgment in his favor, declaring him disabled within the meaning of

the Providence St. Joseph Health Group Long Term Disability ("LTD") Insurance Policy ("the

LTD Policy"), insured by defendant Life Insurance Company of North America ("LINA"), based

upon the Record for Judicial Review.

## III.  INTRODUCTION

Dykman, a 46 year-old software engineer with a PhD in computer engineering, was

diagnosed with relapsing remitting multiple sclerosis ("MS") in 2011 based upon MRI scans that

revealed lesions in his brain and cervical spine. Despite gradually worsening symptoms, Dykman

remained in the workforce and began working as a software developer for Providence in May

2017. He took time off from work during 2018 because of MS exacerbations and left work

permanently on September 8, 2018, due to fatigue, cognitive dysfunction, and blurred and double

vision.

Dykman received short-term disability benefits for the maximum six-month benefit

period provided through Providence's group short-term disability plan. LINA, however, relying

upon file reviews by two in-house physician medical directors, denied Dykman's LTD claim,

submitted under Providence's group LTD coverage. LINA asserted the information on file did

not demonstrate an impairment that precluded Dykman from performing his regular occupation.

Megan E. Glor, Attorneys at Law
707 NE Knott Street, Suite 101
Portland, OR  97212
503-223-7400

Through counsel, Dykman submitted a 39-page ERISA appeal with 16 enclosures, including medical records, supporting lay statements, and medical literature. LINA disapproved the appeal, relying on a paper file review and three addendums by a neurologist consultant; dismissed Dykman's response letters, which provided additional medical records, additional medical literature, and a letter by his treating neurologist that all supported his claim and that refuted the consultant's review and each of the addendums; and affirmed its initial denial of Dykman's LTD claim. LINA asserted that from a neurological perspective, Dykman was not functionally limited and that he had no restrictions/limitations.

LINA erroneously denied Dykman's LTD claim and appeal based upon assertions made by three file review consultants. LINA and its consultants ignored, dismissed, or misstated the medical record, the credible opinions of Dykman's treating providers, and the medical literature. They relied upon assertions that contradicted the medical literature and were inconsistent with the medical record in asserting Dykman was not disabled by his vision problems, fatigue, and cognitive dysfunction. Because the record establishes that Dykman became and remained disabled by vision problems, chronic fatigue, and cognitive dysfunction, augmented by other MS symptoms, judgment under a *de novo* review should be entered in Dykman's favor, and LINA should be ordered to approve and pay his LTD claim under the terms of the LTD Policy.

## IV.  DISCUSSION

The medical record establishes that Dykman is disabled by vision problems, fatigue, and cognitive dysfunction, and also suffers from other common MS symptoms that contribute to his disability. Dykman's medical providers explained in letters that Dykman has been disabled since he left work in September 2018. Dykman and his mother provided written statements describing Dykman's functional limitations, including vision problems that prevent him from using a computer, debilitating fatigue, and cognitive difficulties. All of this evidence is consistent with

the nature of MS, a progressive, incurable disease, as discussed in the medical literature Dykman

provided to LINA.

**A. Dykman Has Proved by a Preponderance of the Evidence that He isDisabled from His Regular Occupation as a Software Developer, and from Any Occupation, under the Terms of the LTD Plan.**

The record establishes that Dykman has been disabled from performing his regular

occupation as a software developer since he left work in September 2018, due to his eye

condition and MS-caused fatigue and cognitive dysfunction. After leaving work, Dykman's

MS-caused symptoms progressed to the point that he became disabled from performing the

material duties of any occupation.

**1. Dykman Moves for Judgment Under ERISA, 29 U.S.C. § 1132(a)(1)(B).**

ERISA provides that a plan "participant" may bring a civil action in federal court

"to recover benefits due to him under the terms of his plan, to enforce his rights under the terms

of the plan, or to clarify his rights to future benefits under the terms of the plan." 29 U.S.C. §

1132(a)(1)(B); *see Metropolitan Life Ins. Co. v. Glenn*, 554 U.S. 105, 108 (2008) ("The

Employee Retirement Income Security Act of 1974 (ERISA) permits a person denied benefits

under an employee benefit plan to challenge that denial in federal court.")

**2. The LTD Plan's Disability Provisions.**

For the first 24 months LTD benefits are payable, LINA promises to pay benefits to

Providence Class 12 employees, including Dykman,[1] if "because of Injury or Sickness," the

claimant is "unable to perform the material duties of his or her Regular Occupation" and is

"unable to earn 80% or more of his or her Indexed Earnings from working in his or her Regular

Occupation." AR 84. Dykman's "regular occupation" was software developer. AR 859, 5562.

---

[1] *See* AR 84.

**Plaintiff's Motion for Judgment Pursuant to Fed. R. Civ. P. 52(a) - Page 3 of 35**

Thereafter, Dykman is considered disabled if due to sickness he is "unable to perform the material duties of any occupation for which he or she is, or may reasonably become, qualified based on education, training or experience;" and is "unable to earn 60% or more of his...Indexed Earnings." AR 84.

### 3. The Applicable Standard of Review is *De Novo.*

The ERISA statute does not state "the appropriate standard of review for actions under § 1132(a)(1)(B) challenging benefit eligibility determinations." *Rabbat v. Standard Ins. Co.,* 894 F. Supp. 2d 1311, 1313 (D. Or. 2012) (quoting *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 109 (1989)). However, the Supreme Court has "prescribed a simple test to determine" the applicable standard of review. *Rabbat,* 894 F. Supp. 2d at 1313. Review is *de novo* "unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire, supra,* 489 U.S. at 115. If the ERISA plan expressly states the administrator has the discretionary authority to determine benefit eligibility or construe the terms of the plan, the applicable standard of review is "abuse of discretion." *Rabbat, supra,* 894 F. Supp. 2d at 1313 (citing *Metropolitan Life Ins. Co. v. Glenn*, 554 U.S. 105, 111 (2008)). Because the policy that insures the Providence LTD Plan (AR 45-175) does not contain a discretionary clause,[2] the applicable standard of review is *de novo*.

Under a *de novo* review in an ERISA-governed benefits case, the court conducts a bench trial pursuant to Rule 52, weighing the evidence in the record and making credibility determinations and factual findings. *See Kearney v. Standard Ins. Co.*, 175 F.3d, 1084, 1095 (9th

---

[2] The certificate of insurance contains a discretionary clause (AR 32), but it has no effect because, (1) Washington, like approximately half the states (including Oregon), has banned discretionary clauses in disability insurance contracts, WAC 284-50-321; (2) the absence of a discretionary clause in the policy controls; the certificate (a summary) does not. *See Grosz-Salomon v. Paul Revere Life Ins. Co.,* 237 F.3d 1154, 1161 (9th Cir. 2001) (discretionary language appearing only in a plan summary that is not fully integrated with the insurance contract cannot be enforced).

Cir. 1999) ("In a trial on the record, but not on summary judgment, the judge can evaluate the persuasiveness of conflicting testimony and decide which is more likely true"); *Rabbat, supra,* 894 F. Supp. 2d at 1314 ("Thus, when applying the *de novo* standard in an ERISA benefits case, a trial on the administrative record, which permits the court to make factual findings, evaluate credibility, and weigh evidence, appears to be the appropriate proceeding to resolve the dispute."). *Coleman-Fire v. Standard Ins. Co.*, 2019 U.S. Dist. LEXIS 76726 at *2 (D. Or. May 7, 2019) ("The Court agrees that a trial on the administrative record is the appropriate procedure to resolve this dispute because it turns on whether Plaintiff's treating and examining doctors' opinions are more reliable and probative of her condition than the consulting physicians' reports").

The claimant has the burden of proof to establish by a preponderance of the evidence that he is disabled and entitled to benefits according to the policy's terms. *Armani v. NW. Mut. Life Ins. Co.,* 840 F.3d 1159, 1163 (9th Cir. 2016). Under a *de novo* review of the record, the Court "does not give deference to the claim administrator's decision, but rather determines in the first instance if the claimant has adequately established that he or she is disabled under the terms of the plan." *See Abatie v. Alta Health & Life Ins. Co.,* 458 F.3d 955, 963 (9th Cir. 2006) ("The court simply proceeds to evaluate whether the plan administrator correctly or incorrectly denied benefits."); *Coleman-Fire*, *supra*, 2019 U.S. Dist. LEXIS 76726, at *26 ("[w]hen a court engages in *de novo* review, it may evaluate and give credence to the [evidence] that it finds more reliable and probative.").

In this case, both Dykman and LINA have agreed that the standard of review is *de novo*. *See Shaw Declaration*.

/ /

/ /

**Plaintiff's Motion for Judgment Pursuant to Fed. R. Civ. P. 52(a) - Page 5 of 35**

Megan E. Glor, Attorneys at Law
707 NE Knott Street, Suite 101
Portland, OR  97212
503-223-7400

4.  **The Medical Record Establishes Dykman's Disability.**

a.  **In 2011, Dykman was Diagnosed With Multiple Sclerosis by Neurologist and MS Specialist, Dr. Kyle Smoot.**

In March 2011, Dykman was seen by neurologist Dr. Hubert Leonard for headaches and an abnormal November 2010 brain MRI. AR 851-54. Dykman was also having "episodes where he awakens feeling exhausted, 'out of it' and variably fatigued with some degree of tingling and weakness in the right arm." AR 851. Dr. Leonard's impression was migraine with aura and "Abnormal brain MRI suggested demyelinating disease." AR 853. In May 2011, neurologist Dr. Kyle Smoot, of the Providence MS Center, noted that brain and spine MRIs obtained in April 2011 (AR 834-38) revealed at least 10 brain lesions and several cervical spine lesions. AR 834. Dr. Smoot assessed relapsing remitting MS and noted that the recent MRIs suggested some progression since the 2010 MRI. AR 837. He prescribed Avonex. AR 839 (5/26/11: "He is scheduled to have his first dose of Avonex…Friday.").

Dykman was monitored and underwent repeat MRI scans. July 2013 cervical and thoracic spine MRIs revealed cervical spinal cord lesions (AR 2736) and a new thoracic cord lesion. AR 2738. A January 2015 brain MRI revealed brain lesions and possible bilateral optic nerve lesions (AR 2751) and an April 2016 MRI confirmed brain lesions and cerebral atrophy. AR 2769-70.

In April 2017, Dr. Smoot noted that Dykman had "had a rough period" after losing his job and struggling to find a new one (AR 3344), but that "[d]espite this rough period - no neurologic issues." AR 3345. Dykman was scheduled to begin working for Providence in May 2017. AR 3344. Dykman was stable on physical examination, with vibratory loss distally. AR 3348. He was experiencing rare episodes of vertigo (AR 3345), sensory disturbance in the feet,

high frequency tremor with extension and slightly reduced vibratory sense in the big toes. AR 3347.

### b. Dykman has a History of Ocular Problems, Including Dry Eyes, which Began to Affect His Focus in 2017.

In November 2014, on Dr. Smoot's referral, Dykman sought treatment for bilateral dry eyes from Sonal Dave, M.D., an ophthalmologist with EyeHealth NW. AR 1445. Dykman was using Restasis and artificial tear drops. *Id*. Dr. Dave noted that Dykman's ocular history included bilateral ("OU") floppy eyelid syndrome ("FES")[3], dry eyes, and keratitis. *Id*. Her impression was tear film insufficiency. AR 1450. In November 2014, the dry eye condition was improving. AR 1441.

By March 2, 2017, however, dry eyes were affecting Dykman's near and far vision bilaterally. AR 1429. On March 28, 2017, Dr. Dave placed punctal plugs to treat his dry eyes and diagnosed "Dry eye syndrome of bilateral lacrimal glands." AR 1427. On April 12, 2016, Zaditor (antihistamine) drops had been added to the treatment regimen. AR 1435.

### c. By May 2018, Dykman Had Missed Some Work Due to Fatigue and Summer Heat Had Caused an Increase in His MS Symptoms.

Dykman saw Dr. Smoot in May 2018. AR 3356-62. He had "missed some work [due to] fatigue and increase in allergies," which were being treated with steroids. AR 3356. He continued to take Tecfidera with "excellent" adherence. AR 3357. Dry eyes continued to be a problem. *Id*. He had increased foot tingling. *Id*. There was also "evidence of a tremor - high frequency with extension." AR 3359. Dr. Smoot documented an "MFIS" (Modified Fatigue

---

[3] FES is characterized by chronic conjunctivitis with symptoms that include chronic eye irritation and, if keratitis is present, decreased vision. AR 594-95 (M. Ventocilla, O.D., *Floppy Eyelid Syndrome* (2018)).

Impact Scale)[4] score of 40/84, corresponding to "fatigued." AR 3359.[5] Dr. Smoot described

Dykman's MS as "stab[le]," but noted, "Fatigue continues to be an issue - MS may be

contributing, but he has OSA [obstructive sleep apnea], which is not being treated." AR 3360.

    In mid-July 2018, Dykman was seen by Leah W. Gaedeke, NP, a nurse practitioner in Dr.

Smoot's MS Clinic. AR 3363-69. NP Gaedeke noted, "he continues to struggle with the heat, this

worsens fatigue and mental clarity, as well as lightheaded[ness]. As a result he is missing more

days of work." AR 3363. The dry eyes continued. Dykman was experiencing "more dizziness

with fatigue." AR 3364. The summer heat had caused a pseudo flare of his MS. AR 3368.

### d. Dykman Left Work on September 8, 2018 Due to Disability Resulting from Vision Problems and MS Symptoms.

    On August 28, 2018, Dykman saw Dr. Dave. AR 1403-07. His dry eyes affected both

near and far focus and caused "trouble focusing from near to distance." AR 1403. Dr. Dave

noted he "tapes OS [left eye] shut when he goes to bed." *Id.* She observed 3+ superficial punctate

keratitis ("SPK")[6] of the left cornea. AR 1406.

    Dykman saw NP Gaedeke on September 20, 2018. AR 3380-86. He had been off work in

July and had experienced a flare up of MS symptoms upon his return to work. *Id.* He had

increased dizziness with fatigue and increased struggles with cognition due to stress in the

workplace. AR 3381. He was using an oral appliance for obstructive sleep apnea. AR 3386. NP

---

[4] "The [MFIS] is a tool that doctors use to evaluate how fatigue affects someone's life." "Fatigue is a common and often frustrating symptom for up to 80 percent of people with [MS]"; "The MFIS involves answering or evaluating a series of questions or statements about your physical, cognitive, and psychosocial health." https://www.healthline.com/health/modified-fatigue-impact-scale (accessed 2/4/21).

[5] The chart on AR 3359 reveals that a score of 0-37 corresponds with "not fatigued" and a score of 38-84 corresponds with "fatigued."

[6] SPK is the "most common sign of cornea inflammation." It is most commonly associated with "dry eye disease" and is also associated with autoimmune disease. AR 580-81 (M. McKenzie, O.D., *A Closer Look at Corneal Inflammation* (2012)).

Gaedeke noted that "[f]atigue continue[d] to be an issue" and that "MS may be contributing" to his fatigue. AR 3385.

On September 24, 2018, Dykman saw his primary care physician, internist Dr. Melanie Doak. AR 3398-3402. She noted that Dykman had been on a leave of absence from work since September 7, 2018, was struggling with fatigue and felt "cognitively foggy." AR 3398. She noted his main MS symptoms were fatigue, numbness in his right arm and leg and mental cloudiness. AR 3399. He had numbness in both feet and weakness in the 4th and 5th fingers of the right hand. AR 3401. Dr. Doak's impression included MS for which he was "on current leave from work," and was "struggling wi[th] mental fogginess and fatigue" and "dry eye syndrome" with "etiology unclear." AR 3402.

 On October 31, 2018, Dr. Dave noted Dykman's dry eye condition was worse, affecting his intermediate vision and causing diplopia (double vision) when he used a computer screen. AR 5338. On examination, Dr. Dave observed 1-2+ SPK of the left cornea. AR 5342.

On November 20, 2018, Dykman's eye condition was stable and was no longer affecting his near or distance vision. AR 5344. On examination, Dr. Dave observed SPK bilaterally and noted the keratitis had increased. AR 5347. On December 11, 2018, the dry eyes were improving, but the condition waxed and waned. AR 5349. Dr. Dave observed SPK bilaterally and stated that left cornea keratitis was greater than right and was a possible cause of the double vision. AR 5353.

On December 27, 2018, Dr. Dave noted Dykman's eye dryness had improved slightly, but that his vision was still blurry. AR 5355. On examination, she observed trace SPK bilaterally. AR 5358. Dykman also saw Dr. Doak on December 27. AR 3403-07. She noted Dykman's ongoing severe dry eyes of unclear etiology that had worsened over the prior three months, causing disability in that the condition precluded Dykman from viewing a computer screen. AR 3403.

Megan E. Glor, Attorneys at Law
707 NE Knott Street, Suite 101
Portland, OR  97212
503-223-7400

Dykman reported that using his left eye was like "looking through sandpaper." *Id*. Dykman's chronic medical problems included MS with main symptoms of fatigue, numbness in the right arm and leg, and mental cloudiness; migraines; and sleep apnea with inability to tolerate CPAP, but using a dental appliance since 2018. AR 3404. His current problems included dry eye syndrome and fatigue, "testosterone level checking for this…more likely related to his MS." AR 3405.

Dr. Smoot noted in his December 26, 2018, office report that Dykman had been unable to work since September 2018 "secondary to difficulty reading the computer screen - develops blurriness which can cause diplopia." AR 3295. Dykman reported "one good hour in the morning. Then if he continues to look at a computer, he will develop headaches." AR 3296. Dykman was frustrated by his vision problems and inability to work. *Id*. He had difficulty with short-term memory recall. *Id*. He had some unsteadiness and right foot weakness. *Id*. His MFIS score was 41, indicating he felt fatigued. AR 3979 (noted on 3/26/19 report).[7] Dr. Smoot noted Dykman's "dry eyes resulting in difficulty focusing" and noted "[s]o unfortunately, he is not able to work." AR 3300.

   e. **The 2019 Medical Record Documents Ongoing MS Symptoms and Vision Problems.**

On February 18, 2019, Dr. Doak noted that Dykman was "still not working due to fatigue" (AR 1362) and that this, along with right arm and leg numbness and mental cloudiness,

---

[7] The right side of several pages of Dr. Smoot's 12/26/18 office note (AR 3295-3301) is cut off in LINA's record, including those that report Dykman's MFIS scores, AR 3298-99. However, AR 3979 (Dr. Smoot's 3/26/19 office note) shows that Dykman's MFIS score on 12/26/18 was 41, and the scales below the MFIS scores confirm that a score in the range of 38-84 indicates "Fatigued." Indeed, that scale is shown on every MFIS chart in the record. *See* AR 3359 (5/24/18), 3298-99 (12/26/18), 3979 (3/26/19). Further, had Dr. Johnkutty truly been confused as to whether Dykman was actually fatigued at the December 26, 2018 appointment, she had only to read Dr. Smoot's comment right in his chart note: "**Fatigue continues to be an issue** - evaluated by Dr. Ramseyer, and he has a FU next month. AR 3300 (emphasis added).

were Dykman's main MS symptoms. AR 1363. Dykman appeared tired. AR 1364. Dr. Doak's

impression included MS, the "cause of his fatigue" and fatigue, "related to MS." *Id.* On March 6,

2019, NP Gaedeke noted Dykman had "struggled to work full time for the past few years." AR

4817. She documented that Dykman had "issues with short-term recall" and was trying to

improve his energy. AR 4818. Dykman's high frequency tremor with extension persisted as did

the reduced vibration sense of the big toe bilaterally. AR 4820. Fatigue "continue[d] to be an

issue" and Dr. Gaedeke confirmed Dykman had "[o]ngoing issues with maintaining gainful

employment due to visual struggles, cognitive fatigue and depression." AR 4821.

     In his March 26, 2019, office report, Dr. Smoot noted Dykman was unable to work

because of visual blurriness and persistent fatigue. AR 3976. While Dykman's vision was

improving, he had experienced difficulty the prior week and was unable to read a computer. *Id.*

Dykman had some unsteadiness and short-term recall difficulty. AR 3977. Dr. Smoot

documented that Dykman was doing well overall with no suggestion of a relapse, but continued

to have "intermittent visual issues[,] which impair his ability to use a computer" and "intractable

fatigue." AR 3980. Dr. Smoot stated Dykman "feels he is unable to work which I support, and

we are in the process of completing the paperwork." *Id.* At LINA's request, Dykman explained

on a LINA "Disability Questionnaire & Activities of Daily Living" form in March 2019 that he

was unable to work full time consistently because of MS-caused severe fatigue, which

necessitated significant rest, and his other MS health issues. AR 4800. He stated that his overall

limited physical and mental capabilities significantly restricted his activities and that his severe

eye issues prevented him from using computer screens for the time required by any position

requiring computer use or long term reading. *Id.*

     Dr. Doak noted in her April 1 and July 29, 2019 office records that Dykman's MS was a

chronic medical problem and documented his main symptoms of fatigue, right arm and leg

**Plaintiff's Motion for Judgment Pursuant to
Fed. R. Civ. P. 52(a) - Page 11 of 35**

Megan E. Glor, Attorneys at Law
707 NE Knott Street, Suite 101
Portland, OR  97212
503-223-7400

numbness, and mental cloudiness. AR 666, 2393-94. A June 23, 2019, brain MRI confirmed MS

with no new or enhancing brain lesions, but with a "[s]table focal lesion in the canalicular

segment of the left optic nerve," which "suggest[ed] sequela of demyelinating plaque." AR 750.

On August 8, 2019, Dr. Smoot noted Dykman had an increase in his fatigue; he continued

to have issues with short-term recall; and his thought process was slower. AR 2601-02. Dr.

Smoot commented that Dykman was doing well overall with "no suggestion of a relapse"; that

his vision had improved slightly with a scleral lens; that he had been "able to use a computer

some," but was "still limited"; and that he had fatigue due to MS, untreated obstructive sleep

apnea, and depression. AR 2601, 2606. Dr. Smoot noted that the cognitive issues were likely due

to MS and depression. AR 2606. He stated that he supported disability, as Dykman's symptoms

left him unable to work. *Id.*

On December 26, 2019, Dr. Smoot noted that Dykman struggled ("choking") using his

dental appliance for sleep apnea. AR 1343-44. He noted the visual symptoms still limited

Dykman's computer use, but that he did not have double vision (diplopia). *Id.* Dykman had

continuing unsteadiness, unchanged, and intermittent leg sensory disturbances. AR 1344.

Dykman's "vision [had] slightly improved - able to use the computer some," but he remained

limited, and he suffered from fatigue caused by MS, untreated obstructive sleep apnea, and

depression. AR 1343. Dr. Smoot stated that Dykman's symptoms precluded him from working

and that he supported Dykman's disability. *Id.*

Dykman continued to treat with Dr. Dave. In January 2019, she observed trace punctate

epithelial erosion of the left eye and ABMD (Anterior Basement Membrane Dystrophy)[8] of both

corneas supranasally; the right eye SPK was significantly improved. AR 5365. In February 2019,

---

[8] ABMD is an inherited corneal disorder resulting from an abnormal buildup of substance under
the surface of the cornea that may present with symptoms including recurrent corneal erosions
and/or blurred vision. AR 1011 (Corneal Dystrophy Foundation website).

**Plaintiff's Motion for Judgment Pursuant to
Fed. R. Civ. P. 52(a) - Page 12 of 35**

Megan E. Glor, Attorneys at Law
707 NE Knott Street, Suite 101
Portland, OR  97212
503-223-7400

Dr. Dave noted Dykman's difficulty focusing. AR 2898. She observed bilateral SPK and bilateral ABMD. AR 2901. While Dykman's dry eye symptoms were significantly improved, Dr. Dave noted he might need future treatment for the punctate keratitis. AR 2902. In March 2019, Dr. Dave documented that Dykman had blurred and double vision because of his eye dryness. AR 2896. She observed 2+ SPK of the left cornea and ABMD of both corneas. AR 2894. She referred Dykman to Oregon Health & Science University for evaluation, to determine if there was a correlation between MS and Dykman's severe dry eye condition. *Id*.

### f. Dykman's Treating Providers Confirmed Dykman is Disabled By Visual Problems and Symptoms of MS.

#### 1. The Opinion by Neurologist Dr. Smoot, Dykman's Treating MS Specialist, that Dykman is Disabled is Fully Credible.

While ERISA regulations do not require claims administrators to give greater weight to treating doctors, *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834 (2003), "[A] district court may, in conducting its independent evaluation of the evidence in the administrative record, take cognizance of the fact . . . that a given treating physician has a greater opportunity to know and observe the patient than a physician retained by the plan administrator." *Jebian v. Hewlett-Packard Co. Emp. Benefits Org. Income Protection Plan*, 349 F.3d 1098, 1109 (9th Cir. 2003) (citations and internal quotations omitted); *See Coleman-Fire*, *supra*, 2019 U.S. Dist. LEXIS 76726 at *27 ("unlike the consulting physicians, Plaintiff's treating and examining physicians were able personally to examine her, observe the effects of her TBI/PCS, and assess the credibility of her self-reports."); *Rabbat, supra*, 894 F. Supp. 2d at 1320 ("[E]vidence showing that the doctors who personally examined the claimant concluded that he was disabled, even though insurance company's non-examining physicians found otherwise, support[s] finding that the claimant was disabled under terms of the plan" (citing *Salomaa v. Honda Long Term Disability Plan*, 642 F.3d 666, 676-79 (9th Cir. 2011)).

**Plaintiff's Motion for Judgment Pursuant to Fed. R. Civ. P. 52(a) - Page 13 of 35**

Dr. Smoot, who has been Dykman's treating neurologist since 2011, is the physician best suited and most capable of providing a comprehensive evaluation of Dykman. Dr. Smoot concluded that Dykman was disabled by his MS symptoms of physical fatigue, cognitive dysfunction, and a visual disorder. AR 3791. He stated that Dykman's disabling MS symptoms and visual disorder precluded him from performing not only his own occupation, but any occupation or work. *Id.*

Dr. Smoot stated on a Health Care Provider Certification form dated December 13, 2018 that Dykman had been incapacitated by MS and certified continuous leave from September 10, 2018 through January 7, 2019. AR 5574-77. He explained that MS "is a chronic progressive disease of the central nervous system with unpredictable periods of relapse/flares," that conditions "such as exposure to heat, stress, illness/infection, etc. may temporarily worsen symptoms until the conditions resolve," and that MS is a lifelong condition. AR 5575. Dr. Smoot stated in a letter dated January 3, 2019, that his patient was having visual problems with dry eyes that resulted in blurriness and diplopia and caused difficulty focusing and reading a computer screen, and thus had been unable to work since September. AR 5321. Dr. Smoot added that Dykman could not and "should not do any work that requires the use of his vision at this time and that there was "no return to work plan at this time." *Id.*

In response to LINA's claim denial, Dr. Smoot explained by letter dated September 16, 2019, that he had treated Dykman since May 2011 and had seen Dykman several times over the past two and a half years. AR 4609. He affirmed "[i]t is unequivocal that Mr. Dykman's relapsing remitting MS has taken a toll on him." AR 4611. Dr. Smoot explained that Dykman also "suffers from dry eyes that have caused blurriness and diplopia" and that "[h]is dry eye condition led to an inability to read computer screens for more than an hour or so and was the basis for his disability in September 2018." *Id.* Dr. Smoot stated he initially believed Dykman's

Megan E. Glor, Attorneys at Law
707 NE Knott Street, Suite 101
Portland, OR  97212
503-223-7400

visual disorder was unrelated to MS, but, after the June 2019 MRI that revealed an optic nerve

lesion, he now believed Dykman's "blurriness and diplopia may be, at least in part, due to MS."

*Id.*

Dr. Smoot stated Mr. Dykman's primary MS symptoms include "fatigue and cognitive

dysfunction, which are constant, ongoing, and have become disabling." *Id*. In *Kibel v. Aetna Life

Ins. Co.,* 725 Fed. Appx. 475, 477 (9th Cir. 2018) (unpublished), the Court explained, Fatigue in

MS patients "is caused by demyelination in the central nervous system," and is described by

many patients "as their most debilitating symptom." *Id.* (quoting Stachowiak, Julie, *The Multiple

Sclerosis Manifesto*, p. 52 (2010). "Fatigue in MS patients may also be caused not "directly by

the MS disease process itself," but may result from "living with all [the other MS] symptoms and

trying constantly to compensate for abilities [MS patients] used to have." *Id.* (citing Stachowiak,

p. 53). "For MS patients, fatigue is 'an overwhelming tiredness that is not directly related to

increased activity.'" *Id.* (citing at Stachowiak, p. 53).

Dr. Smoot noted that intermittent symptoms of "weakness, dizziness/vertigo, sensory

disturbance of the feet, and extension tremors" contribute to his disability. AR 4611. He

concluded:

> In sum, Mr. Dykman suffers from relapsing remitting MS with progressive
> ongoing symptoms of physical fatigue, cognitive dysfunction, and a visual
> disorder that have proven to be disabling. Even though Mr. Dykman has
> experienced relatively few MS relapses, it is not necessary to experience relapses
> or exacerbations for symptom progression to occur, as has happened in Mr.
> Dykman's case.

*Id*. Dr. Smoot explained that improvement was unlikely given that MS is incurable:

> As MS is an incurable disease, Mr. Dykman's prognosis for any substantial
> improvement in his fatigue, his cognitive dysfunction, or his visual disorder that
> would allow him to return to work is guarded at best. Mr. Dykman's disabling MS
> symptoms, including his visual disorder, preclude him from performing not only
> his own occupation, but any type of occupation or work.

**Plaintiff's Motion for Judgment Pursuant to
Fed. R. Civ. P. 52(a) - Page 15 of 35**

Megan E. Glor, Attorneys at Law
707 NE Knott Street, Suite 101
Portland, OR 97212
503-223-7400

*Id.*

In his final letter, dated March 27, 2020, Dr. Smoot stated that over the years, Dykman's "MS has progressively increased in severity," explaining that "MS lesions that initially were only present in his brain are now present in his cervical spine, thoracic spine, and left optic nerve." AR 3791. He stated that while Dykman's "[d]isabling symptoms that initially involved vision difficulties resulting in blurriness, occasional diplopia, difficulty focusing, and difficulty reading a computer screen now also include fatigue and cognitive dysfunction" and that, "[i]n addition, Mr. Dykman continues to experience intermittent weakness, dizziness/vertigo, sensory disturbances of the lower extremities, extension tremors, and dry eyes, all of which contribute to his disability." *Id.*

Dr. Smoot explained that as of March 2020, Dykman continued to be limited in his computer use due to his visual problems:

> Mr. Dykman's dry eyes and his MS-caused visual problems both contribute to his blurred vision and occasional diplopia, which has resulted in difficulty reading computer screens and has limited his time using a computer to one or two hours/day. As I stated in my December 26, 2019 progress note, even though Mr. Dykman's vision has improved somewhat because of treatment, his computer use is still limited.

*Id.* Dr. Smoot reiterated that Dykman's MS symptoms and visual disorder continue to disable him from all employment:

> At present, Mr. Dykman is primarily disabled by his MS symptoms of fatigue and cognitive dysfunction, both of which are constant, ongoing, and disabling. As I noted in my September 16, 2019 letter, even though Mr. Dykman has experienced relatively few MS relapses, relapses or exacerbations are not required for symptom progression to occur. As MS is an incurable disease, Mr. Dykman's prognosis is guarded at best for any substantial improvement in his fatigue or cognitive dysfunction that would allow him to return to work. Mr. Dykman's disabling MS symptoms plus his visual disorder continue to preclude him from performing not only his own occupation, but any type of occupation or work.

*Id.*

//

Megan E. Glor, Attorneys at Law
707 NE Knott Street, Suite 101
Portland, OR 97212
503-223-7400

**2.  Three Other Treating Medical Providers Confirmed Dykman was Disabled as the Result of MS Symptoms.**

In February 2019, Dykman's treating psychiatrist[9], Dr. Zarling, stated in a Behavioral Health Questionnaire form (AR 1300-03) that in general, Dykman was "able to perform the cognitive and instrumental tasks of his job," but that "his experience of physical fatigue and lack of stamina, combined with eye discomfort impair his ability to sustain effort on [a] computer screen." AR 1303.

In a March 27, 2019 letter, NP Gaedeke explained she was treating Dykman for MS and migraines and that he had been referred "to the Casey Eye Institute for a rare eye problem which causes significant dry eyes, blurred vision, eye fatigue, and intermittent blindness" and that this eye problem was the primary reason he was unable to continue working. AR 4864. She explained that he also had "ongoing significant physical and cognitive fatigue, despite a normal physical exam," which are very common symptoms of MS, "due to denervation in the central nervous system" and that these symptoms had "prevented him from remaining gainfully employed." *Id*.

In a letter dated October 21, 2019, Dr. Dave stated that she had been following Dykman since September 2018 and that he "had developed a dry eye condition with blurriness and diplopia" that "waxed and waned," but did not affect his near or distance vision, although he "did experience diplopia when using a computer screen." AR 3971. Dr. Dave concluded that Dykman's visual problems were the result of bilateral dry eye syndrome of the lacrimal glands. *Id*. She noted bilateral FES, bilateral corneal keratitis, and ABMD of the cornea bilaterally contributed to his visual difficulties. *Id*. She stated that the left optic nerve lesion revealed on the June 2019 brain MRI scan was "indicative of MS-caused optic neuritis, an inflammatory and

---

[9]Dr. Zarling's treatment notes for the period 10/23/18-211/18 are also in the record. AR 1305-10.

demyelinating condition that leads to blurriness, decreased vision and pain" and that Dykman

continued to "not be able to work because [of] this condition." AR 3972.

### g. Dykman and His Mother Provided Observations that Corroborate the Medical Record.

Dykman's mother, Susan Driver, attested to Dykman's struggles in her letter of August

2019, and described how his progressive MS had resulted in severe functional limitations:

> I have observed his continued decline over the years, most noticeable in the past year. His disabling conditions have worsened; **he requires at least 12-14 hours of sleep or rest a day**; he is **unable to concentrate**; his **memory is poor**. He has **muscle spasms are worse**; and he has **increased difficulty walking**. He now has **problems seeing** and **can't look at a computer screen or do close work** without experiencing blurred or decreased vision and experiencing eye pain.

AR 857 (emphasis added). Ms. Driver made the following observations about her son:

- Nathan is extremely fatigued, requiring 12-14 hours of rest or sleep per day...
- He is not able to look at a computer screen for more than an hour or so before his eyes prevent him from continuing...
- His memory is poor. He will watch the same TV program repeatedly. When I ask him why, he says he hasn't watched it before.
- He is not able to manage his bills, especially his medical bills, which went to collection. I now manage his bills making sure they are paid.
- He forgets doctor appointments and other tasks. I write everything down for him and post stickers for reminders.

AR 858.

Dykman explained in a September 2019 written statement that he had been a passionate

and "highly successful software engineer, with [a] PhD in computer science," but that he now

could "not even program a computer due to the overall fatigue and cognitive issues" that had

"worsened noticeability in the past year." AR 859. He stated that his ability to work consistently

had dissipated over the prior two years and that many days he could do only the bare minimum

required to make it through the day because of fatigue and cognitive problems. He explained that

he must limit his overall computer use as his vision becomes blurry if he uses a computer for

more than an hour at a time, which precludes him from working as a software engineer. *Id.* He

explained that no treatment for his fatigue had worked and that he was diligently doing whatever is possible to treat his MS. *Id.*

These descriptions of Dykman's decline and disability are consistent with the medical record as a whole and the fact MS is a progressive, incurable disease. In *Laurie v. United of Omaha Life Ins. Co.*, 2017 U.S. Dist. LEXIS 35430 (D. Or. Jan. 23, 2017), this Court criticized the ERISA insurer for "discounting or ignoring Laurie's subjective complaints" and "discount[ing] or ignor[ing] evidence corroborating those complaints" in "letters from her colleagues and friends." *Id*. at *49 (citing, *inter alia*, *Demer v. IBM Corp. LTD Plan*, 835 F.3d 893, 905 (9th Cir. 2016) (insurer abused its discretion in rejecting claimant's subjective complaints, which were corroborated by a friend)). In *Laurie,* this Court concluded:

> ...**these letters are highly probative of the issue presented in this case: whether Laurie's subjective CFS symptoms prevent her from working**. Four of Laurie's colleagues, a long-term friend, and her pastor all submitted letters corroborating the effects of her CFS.

*Id*. (emphasis added). *See also Gorena v. Aetna Life Ins. Co.,* 2018 U.S. Dist. LEXIS 104071 at *19 (W.D. Wash., June 15, 2018) (consultants' reviews "completely overlook Plaintiff's subjective reports of her symptoms (which lend further support to her assertions of disability due to MS), without stating any basis for questioning her credibility.")

**B.  LINA Erroneously Denied Dykman's Claim and Appeal,  Relying Upon File Reviews Prepared by Consultants Who Ignored and Misstated the Record and the Nature of MS.**

LINA relied upon file reviews by in-house neurologist and medical director, Dr. Lawrence Teitel (AR 1311-12, 4/1/19), and in-house ophthalmologist and medical director, Dr. Houman Vosoghi (AR 4353-55, 4/4/19) in denying Dykman's claim in April 2019. AR 4356-59. Pointing to Dr. Teitel's review, LINA asserted there was "no clinical evidence in the medical records to support a conclusion of functional limitations from a physical standpoint" AR 4358.

Megan E. Glor, Attorneys at Law
707 NE Knott Street, Suite 101
Portland, OR  97212
503-223-7400

LINA repeated Dr. Vosoghi's mistaken assertion that while MS flare ups can cause diplopia, blurred vision, and loss of vision, Dykman "did not present with current flare-up and associated visual deficits." *Id.* The conclusions of LINA's consultants/medical directors are riddled with errors and omissions of material facts and ignore the nature of MS. Neither physician examined Dykman. *See Salomaa, supra,* 642 F.3d at 676 ("The medical record by physicians who actually examined Salomaa is entirely one sided in favor of Salomaa's claim. The plan rejected its opportunity to see if there was another side.").

After receiving Dykman's October 1, 2019 appeal, LINA commissioned a third file review, which was prepared by neurologist Dr. Suja Johnkutty, dated November 26, 2019. AR 4004-09. She erroneously asserted there was no medical evidence to support from a neurological perspective that Dykman had been functionally limited since leaving work in September 2018. AR 4008. Dr. Johnkutty's conclusion disregards the medical record as a whole.

None of LINA's consultants spoke with Dykman's treating providers to discuss whether their conclusions were consistent with observations and impressions they had formed treating Dykman over many months—or, in the case of Dr. Smoot, many years. *See Montour v. Hartford Life & Accident Ins. Co.,* 588 F.3d 623, 634 (9th Cir, 2009) (Plan did not require a physical exam by consultants, but making the choice to forgo an examination raised "questions about the thoroughness and accuracy of the benefits determination"); *Stout v. Hartford Life & Accident Ins. Co.,* 58 F. Supp. 3d 1020, 1028 (N.D. Cal. 2013) (Consultants' failure to examine the plaintiff or speak with her treating physician "'raises questions about the thoroughness and accuracy of the benefits determination.'" (quoting *Montour*, citing *Bennett v. Kemper Nat'l Servs., Inc.,* 514 F.3d 547,554 (6th Cir. 2008)).

/ /

/ /

**1. Dr. Teitel Ignored and Misstated the Medical Record and Failed to Consider the Nature of MS in Erroneously Asserting Dykman was Not Disabled.**

Dr. Teitel acknowledged Dykman's MS diagnosis and admitted he suffered a dry eye condition that interfered with viewing a computer screen. AR 1311-12. Yet, Dr. Teitel asserted: "Medical documentation...does not support restriction for work based on visual impairment from dry eyes or MS condition." AR 1312. Asked, "Is the customer functionally limited?", Dr. Teitel answered "No." *Id.* Asked, "Considering the customer's functional limitations and the treatment(s) required for their condition(s), what medically necessary activity restrictions are appropriate?", he responded, "None." *Id.*

Dr. Teitel's review omitted analysis of medical reports that documented Dykman's symptoms and disability. It failed to take into account Dykman's MS-caused physical fatigue and cognitive fatigue and his ophthalmic conditions other than dry eyes, which contributed to his disability. Dr. Teitel's assertions, especially his assertions that Dykman had "central visual acuity at near and distance" and that the "dry eyes condition does not affect distance or near vision" (AR 1312) ignored that Dykman began to experience blurriness/double vision resulting from dry eye after viewing a computer screen for an hour or so." *See* AR 3295 (Dr. Smoot 12/26/18: "he has not been able to work since September secondary to difficulty reading the computer screen - develops blurriness which can cause diplopia.") *See also* AR 3296 (Dr. Smoot "Feels like he has one good hour in the morning. Then if he continues to look at a computer, he will develop headaches.")

LINA's record included the reports of 18 office visits with treating providers from May 24, 2018 through March 19, 2019. AR 183-90. Dr. Teitel made cursory comments regarding only eight visits, gave no consideration to Dykman's physical and cognitive fatigue and ignored his

Megan E. Glor, Attorneys at Law
707 NE Knott Street, Suite 101
Portland, OR  97212
503-223-7400

ophthalmic conditions of ABMD, keratitis and FES. He omitted discussion of following records

supporting disability:

• 5/24/18: Dr. Smoot noted Dykman had missed work because of fatigue, continued to have dry eyes and experienced increased foot tingling, had high frequency tremor with extension and reduced vibration sense of the right big toe, reported that fatigue from MS and obstructive sleep apnea continued to be an issue, and had a MFIS score of 40, i.e., he was fatigued. AR 3356-60.

• 7/18/18: NP Gaedeke noted Dykman continued to have dry eyes, MS-caused fatigue and increased dizziness with fatigue. She observed a high frequency tremor with extension and vibratory loss distally. Dykman's fatigue and mental clarity were worse with the summer heat, which had caused a pseudo MS flare. His MS-caused fatigue and obstructive sleep apnea continued to be an issue. AR 3363-68.

• 9/11/18: Dr. Dave documented that Dykman continued to experience dry eyes and noted his history of bilateral FES, keratitis and observed SPK of the left cornea. AR 5040-43.

• 9/20/18: NP Gaedeke noted that Dykman had been absent from work the entire month of July due to an MS flare, that he continued to have dry eyes and had increased dizziness with fatigue, decreased energy, increased cognition problems; and observed a high frequency tremor with extension and vibratory loss distally. Dykman reported that his MS symptoms were much worse and fatigue continued to be an issue. AR 3380-86.

• 9/24/18: Dr. Doak noted Dykman had been on a leave of absence from work since 9/7/18. She noted he struggled with fatigue, his main issue, and had cognitive fog, foot numbness, weakness in the 4th and 5th fingers of the right hand. AR 3398-3402.

• 10/8/18: Dr. Dave observed 2+ SPK of the left cornea. AR 5048.

• 10/31/18: Dr. Dave noted Dykman's dry eye condition was worsening and affecting his intermediate vision and that he experienced double vision when using a computer screen. He had elevated intraocular pressure bilaterally and 1-2+ central SPK of the left cornea. AR 5338-42.

• 11/20/18: Dr. Dave found Dykman had 1-2+ SPK of the right cornea, 2+ SPK of the left cornea, and that the keratitis had increased. AR 5347.

• 12/11/18: Dr. Dave observed Dykman's dry eye condition waxed and waned and found trace SPK of the right cornea and 2+ SPK of the left cornea. She identified keratitis as a possible cause of Dykman's double vision. AR 5349-53;

• 12/26/18: Dr. Smoot documented vision problems of blurriness and diplopia caused difficulty focusing and an inability to work. He noted Dykman's continuing fatigue and issues with short-term memory recall (AR 3387-93) and MFIS score of 41 indicating fatigue. AR 3979.

**Plaintiff's Motion for Judgment Pursuant to
Fed. R. Civ. P. 52(a) - Page 22 of 35**

Megan E. Glor, Attorneys at Law
707 NE Knott Street, Suite 101
Portland, OR  97212
503-223-7400

• 12/27/18: Dr. Dave noted Dykman's vision was still blurry even though his eye dryness had slightly improved. He observed elevated intraocular pressure bilaterally, trace SPK of the right cornea, and 1-2+ SPK of the left cornea. AR 5355-58.

• 12/27/18: Dr. Doak confirmed Dykman's dry eye condition caused his disability by precluding him from working with a computer and was severe and ongoing. While the etiology of his dry eyes was unclear, his dry eye condition had worsened over the past three months. Dykman's main MS symptoms were fatigue, right arm and leg numbness, and mental cloudiness. AR 3403-05.

• 1/10/19: Dr. Dave observed ABMD of both corneas and trace punctate erosion of the left eye. AR 5365.

• 2/12/19: Dr. Dave noted Dykman's trouble focusing. She observed trace SPK of the right cornea, 1-2+ SPK of the left cornea and ABMD of corneas. She stated keratitis might need to be treated in the future. AR 2898-2902.

• 2/18/19: Dr. Doak noted Dykman was not working due to fatigue. His main MS symptoms were fatigue, right arm and leg numbness, and mental cloudiness. Dr. Doak observed a tired appearance. Her impression included MS and fatigue. AR 1362-64.

• 3/6/19: NP Gaedeke stated Dykman had struggled to work full time the past few years. Dykman's visual symptoms and sensory disturbances were unchanged. He had cognitive issues with short-term memory recall. NP Gaedeke observed a high frequency tremor with extension and a reduced vibration sense of the big toes. She noted his ongoing issues regarding "maintaining gainful employment" included fatigue, visual struggles, and cognitive fatigue. AR 4817-21.

*See Gallegos v. Prudential Ins. Co. of Am.,* 2017 U.S. Dist. LEXIS 86123 at *29 (N.D. Cal., June 5, 2017) (Prudential's consultant's failed to take into account the evidence from Plaintiff's treating physicians and often directly contradicted the evidence without adequate explanation.)

Dr. Teitel's conclusions ignored and failed to consider the well-known nature of MS, as discussed in the medical literature. The article *Multiple Sclerosis* (AR 486) confirms that seven symptoms documented in Dykman's medical record are symptoms of MS: 1) paresthesias, 2) intention tremor, 3) optic neuritis, 4) diplopia, 5) heat intolerance (an increase in fatigue/ weakness when exposed to high temperature due to weather, exercise, showers, or fevers), 6) fatigue (occurs in 70-75% of cases—an overwhelming feeling of lassitude or lack of physical or mental energy that interferes with activities) and dizziness, and 7) cognitive dysfunction (occurs

in 40-70% of patients—may affect comprehension and use of speech, attention, memory, visual perception, planning, problem solving, executive function, and abstract reasoning). AR 500-03.

Fatigue, one of Dykman's persistent, disabling symptoms, is "one of the most common and disabling symptoms of MS" and there are "no FDA-approved drugs for treatment of MS-related fatigue." AR 533. The article states that the "progression of physical and cognitive disability in MS may occur in the absence of clinical exacerbations" (AR 500) and that approximately half of patients with relapsing remitting MS "convert to a secondary progressive pattern within 10-15 years after disease onset," which "may or may not include relapses, but it is characterized by continued progression over years with increasing disability." AR 511.

Dr. Teitel's assertion there were "no co-limiting conditions which may independently or collectively impact the customer's functionality" or medical records supporting "restriction for work based on visual impairment from dry eyes or MS condition" ignored clear evidence of visual difficulties, fatigue, and cognitive dysfunction. AR 1312. His assertion that Dr. Smoot, Dr. Dave, and Dr. Doak's opinions are not supported by clinical evaluation or imaging and are inconsistent with the medical evidence (*Id.*) is patently false.

## 2. Dr. Vosoghi's Error-Filled Review Ignores Material Evidence of Disability from Visual Problems and MS and Ignores the Nature of MS.

Dr. Vosoghi addressed Dykman's dry eye condition and possible optic neuritis, only. He did not discuss the non-visual manifestations of Dykman's MS. AR 4353-55. He identified possible optic neuritis and bilateral dry eye syndrome as co-morbid MS conditions that might impact Dykman's functionality. AR 4353-54. Yet, even though he acknowledged MS flareups could involve Dykman's vision and result in blurriness, diplopia, and loss of vision, he asserted Dykman was not "functionally limited visually" and that no restrictions were necessary

regarding optic neuritis or dry eye syndrome because Dykman did not have a current flareup. AR

4354.

Dr. Vosoghi's conclusions are erroneous for many of the reasons Dr. Teitel's conclusions

are erroneous. His review was cursory, omitting medical records supporting Dykman's disability.

It failed to take into account Dykman's ophthalmic conditions other than dry eyes and reached

conclusions contrary to medical literature regarding MS and Dykman's visual problems.

Of Dykman's 18 office visits in 2018-2019, including eight with ophthalmologist Dr.

Dave, Dr. Vosoghi addressed only four office visits, and noted two letters. AR 4354-55. He

omitted or ignored copious medical evidence of disability:

• 5/24/18: Dr. Smoot noted Dykman continued to have dry eyes. AR 3357.

• 7/18/18: NP Gaedeke noted Dykman continued to have dry eyes. AR 3364.

• 9/11/18: Dr. Dave noted Dykman continued to have dry eyes, noted history of bilateral
FES and bilateral keratitis; observed 2+ SPK of the left cornea. AR 5040-43.

• 9/20/18: NP Gaedeke noted Dykman had been absent from work the entire month of
July due to an MS flare and continued to have dry eyes. AR 3380-81.

• 10/8/18: Dr. Dave observed 2+ SPK of the left cornea. AR 5048.

• 10/31/18: Dr. Dave noted Dykman's dry eye condition was worsening and affecting his
intermediate vision and that he experienced double vision when using a computer screen, and
observed bilateral elevated intraocular pressure, 1-2+ SPK of the left cornea. AR 5338-42.

• 11/20/18: Dr. Dave observed 1-2+ SPK of the right cornea, 2+ SPK of the left cornea,
and noted that the keratitis had increased. AR 5344-47.

• 12/11/18: Dr. Dave noted Dykman's dry eye condition waxed and waned, observed
trace SPK of the right cornea and 2+ SPK of the left cornea, and stated the keratitis was a
possible cause of Dykman's double vision; AR 5349-53.

• 12/26/18: Dr. Smoot noted Dykman's vision problems resulted in difficulty focusing
and an inability to work and included blurriness and double vision. AR 3387.

• 12/27/18: Dr. Dave noted Dykman's vision was still blurry even though his eye dryness
had slightly improved and observed elevated intraocular pressure bilaterally, trace SPK of the
right cornea, and 1-2+ SPK of the left cornea. AR 5355-58.

Megan E. Glor, Attorneys at Law
707 NE Knott Street, Suite 101
Portland, OR  97212
503-223-7400

• 12/27/18: Dr. Doak noted Dykman's dry eye condition caused his disability by precluding him from working with a computer and that the condition was severe and ongoing and had worsened over the past three months. AR 1366.

• 1/3/19: Dr. Smoot noted Dykman could not and should not do any work requiring use of his vision, as it worsened his symptoms and could cause safety issues. AR 5033.

• 1/10/19: Dr. Dave observed ABMD of both corneas supranasally and trace punctate epithelial erosion of left cornea. AR 5365.

• 2/12/19: Dr. Dave observed ABMD of both corneas, trace SPK of right cornea and 1-2+ SPK of left cornea that might need future treatment. AR 2898-2902.

• 3/6/19: NP Gaedeke noted Dykman had struggled to work full time the past few years and that his visual symptoms were unchanged and that his ongoing issues regarding "maintain[ing] gainful employment" included his visual struggles. AR 4817-21.

• 3/27/19: NP Gaedeke noted that Dykman's ongoing significant physical and cognitive fatigue were very common in MS due to denervation in the central nervous system and that his symptoms had "prevented him from remaining gainfully employed" and that she supported Dykman's continued time off from work. AR 4864.

*See Gallegos, supra*, 2017 U.S. Dist. LEXIS 86123 at *29.

Dr. Vosoghi addressed the dry eye condition and possible optic neuritis, but failed to

address Dykman's ophthalmic conditions of ABMD, keratitis, and FES. AR 4353-55. All of

these adversely affected Dykman's vision and contributed to his blurred and double vision. The

medical literature states that ABMD "may present with a variety of symptoms, including

recurrent corneal erosions and/or blurred vision" (AR 1011) and that medical therapy "is

generally ineffective for management of blurred vision associated with anterior basement

membrane dystrophy." AR 1012. It explains that SPK is the "most common sign of cornea

inflammation" and is most commonly associated with "dry eye disease" and is also associated

with autoimmune disease. AR 580-81. It explains that FES is characterized by chronic

conjunctivitis with symptoms that include chronic eye irritation and, if keratitis is present,

decreased vision. AR 594-95.

Megan E. Glor, Attorneys at Law
707 NE Knott Street, Suite 101
Portland, OR 97212
503-223-7400

Dr. Vosoghi asserted that Dykman's dry eye condition could "be managed with the current treatment plan" (AR 4354), ignoring that Dykman's current treatment had been **unsuccessful** in eradicating his dry eye condition, which waxed and waned. AR 5061. He acknowledged that "MS can result in flare-ups involving vision with symptoms of diplopia, blurred vision, loss of vision," but asserted that Dykman did not present with a "current flare-up and associated visual deficits." AR 4354. His implicit conclusion that Dykman would have to have had an MS flare to experience his visual symptoms was erroneous. The medical literature confirms that the most common visual problems caused by MS are decreased or blurred vision, caused by optic neuritis, diplopia, and nystagmus. AR 1037. It explains that "visual problems in MS can also be brought on" not only by relapses, but also "by fatigue, an increase in temperature, stress, and infection." AR 1037-38. It also explains that "the progression of physical disability and cognitive disability in MS may occur in the absence of clinical exacerbations." AR 500. Thus, it was entirely plausible that Dykman experienced worsening of his MS-caused visual problems and/or other MS symptoms in the absence of a relapse.

Dr. Vosoghi quoted medical records to support his conclusion Dykman was not functionally limited and did not require any medically necessary work restrictions, yet four of his five snippets document functional problems, MS symptoms and/or visual abnormalities:

> Letter, Kyle Smoot, MD, 1/3/19, "**dry eyes resulting in difficulty focusing**. He **has not been able to work since September, secondary to difficulty reading the computer screen—develops blurriness which can cause diplopia**…"

> Progress Note, Sonal Dave, MD, 1/10/19, the claimant is seen for evaluation of pressures in the eyes. Examination findings included VA of 20/30-3 OD; 20/40+1 OS; IOPs of 17 and 18 for OD and OS, respectively; PEERLA, **punctal plug in place RLL, LUL/LLL [for dry eyes]; ABMD supranasally OU**.

> Progress Note, Sonal Dave, MD, 2/12/19, the claimant is seen for dry eyes bilaterally since a month ago. He states eyes get ''goopy'' but improved a lot. Examination findings included VA of 20/40+1 OD; 20/40+2 OS; IOPs of 17 and 18 for OD and OS, respectively; PEERLA, clear lens capsule, cortex and nucleus,

Megan E. Glor, Attorneys at Law
707 NE Knott Street, Suite 101
Portland, OR  97212
503-223-7400

deep and quiet anterior chamber bilaterally, **+ABMD superiorly and inferiorly OD and OS**.

Progress Note, Leah Gaedeke, NP, 3/6/19, the claimant presented to follow-up on relapsing remitting MS. Examination is stable apart from vibratory loss distally. An MRI of the brain from May of 2017 was stable. MRI of the cervical spine on July 2013 was also stable. Examination findings included full visual fields, symmetrical pupils with no apparent pupillary defect.

Letter, Leah Gaedeke, NP, 3/27/19, '**significant dry eyes, blurred vision, eye fatigue and intermittent blindness. This is the primary reason he is unable to continue working… He experiences ongoing significant physical and cognitive fatigue, despite a normal physical exam, which is a very common symptom of Multiple Sclerosis**…'

AR 4354-55 (emphasis added).

Dr. Vosoghi's review lacks credibility because it ignores the medical record as a whole and is inconsistent with the medical literature, fails to consider the effects of ABMD, keratitis, and FES on Dykman's vision and ignored the medical evidence that Dykman's visual symptoms were consistent with MS and his other ophthalmic diagnoses.

### 3. LINA Erroneously Relied upon Dr. Johnkutty's File Review and Addendums in Denying Dykman's Appeal.

LINA commissioned a file review by a neurologist-consultant, Dr. Johnkutty, after it received Dykman's October 1, 2019 appeal. In her review, dated November 26, 2019, Dr. Johnkutty erroneously asserted there was no medical support from a neurological perspective that Dykman had been functionally limited since leaving work in September 2018. AR 4004-09. Dr. Johnkutty's conclusion disregards the medical record as a whole.

#### a. Dr. Johnkutty ignored substantial evidence of vision problems.

In her review, Dr. Johnkutty acknowledged there were "multifactorial causes" for Dykman's blurred vision; evidence of a lesion on the left optic nerve (AR 4007); and that his "dry eyes" diagnosis was attributed to dysfunction of the lacrimal gland. AR 4008. She acknowledged Dr. Dave's statement that his vision "causes him to be unable to read the

computer." *Id*. In disregard of this evidence, she asserted Dykman did not have visual restrictions

or limitations. *Id.* Her assertion ignored copious evidence that **visual difficulties** contributed to

Dykman's disability:

   • 10/31/18: Dr. Dave noted Dykman's dry eye condition was worsening, affected his
intermediate vision, and he experienced diplopia when using a computer screen. AR 5338.

   • 12/11/18: Dr. Dave noted Dykman's dry eye condition waxed and waned (AR 5061) and
noted corneal keratitis was a possible cause of Dykman's double vision. AR 5065

   • 12/26/18: Dr. Smoot noted Dykman's dry eye condition caused blurriness, inability to focus,
and double vision that resulted in his inability to work, as he was only able to view a computer
screen for an hour or so in the morning. AR 3387-88.

   • 12/27/18: Dr. Dave noted Dykman's eye dryness had slightly improved, but his vision
remained blurry. AR 5355.

   • 12/27/18: Dr. Doak noted Dykman's severe dry eye condition, unclear etiology, worse over
past three months, caused disability by precluding him from viewing computer screen. AR 1366.

   • 3/6/19: NP Gaedeke noted Dykman's visual symptoms were unchanged and that his ongoing
issues "maintain[ing] gainful employment" included visual struggles. AR 4817-21.

   • 3/19/19: Dr. Dave documented dry eyes and that Dykman's vision was blurry with double
vision because of the dryness. AR 2890.

   • 3/26/19: Dr. Smoot noted Dykman was unable to work because of visual blurriness,
difficulty reading the computer and persistent fatigue and had continued "intermittent visual
issues which impair his ability to use a computer" and "intractable fatigue." Dr. Smoot supported
Dykman's inability to work. AR 3976, 3980.

   • 8/8/19: Dr. Smoot noted Dykman had been diagnosed with dry eyes at Casey Eye Institute
and had received a scleral lens that slightly helped, letting him "use the computer some" (AR
2601), but that he was still limited. AR 2606. He stated Dykman was unable to work. *Id.*

*See Gallegos v. Prudential Ins. Co. of Am., supra*, 2017 U.S. Dist. LEXIS 86123 at *29.

       Dr. Johnkutty failed to address Dykman's other eye problems and ignored medical

literature submitted with the appeal describing how these conditions—ABMD (AR 1011-13),

keratitis (AR 579-87), and FES (AR 1027-36)—can cause visual difficulties. She ignored Dr.

Smoot's and Dr. Dave's opinions that Dykman's visual problems were disabling, as stated in

**Plaintiff's Motion for Judgment Pursuant to
Fed. R. Civ. P. 52(a) - Page 29 of 35**

Megan E. Glor, Attorneys at Law
707 NE Knott Street, Suite 101
Portland, OR  97212
503-223-7400

their January and September 2019 (Dr. Smoot) and October 2019 (Dr. Dave) letters. *See* pp.

14-15, p. 17, *supra* (addressing AR 5033, 4609-11(Dr. Smoot 1/3/19, 9/16/19), AR 3971-72 (Dr.

Dave, 10/21/19)).

### b. Dr. Johnkutty ignored substantial evidence of disability.

Dr. Johnkutty acknowledged Dykman's persistent fatigue "complicated by multifactorial

factors: depression, anxiety, untreated sleep apnea and multiple sclerosis" and that he reported

cognitive issues. AR 4008. However, citing the June 2019 MRI report, she asserted Dykman's

MS had been stable since 2017 and that there was "no support from a neurological perspective"

he was disabled. *Id.* This was contrary to the medical record, which documents severe, persistent

fatigue and cognitive dysfunction. Indeed, Dr. Johnkutty also ignored copious medical reports

documenting disabling physical and cognitive fatigue:

• 5/24/18: Dr. Smoot documented Dykman missed work due to fatigue, noted his MFIS score of 40 indicated fatigue, and confirmed fatigue continued to be an issue. AR 3356-60.

• 7/18/18: NP Gaedeke explained heat worsened the fatigue and mental clarity and that fatigue caused increased dizziness and continued to be an issue. AR 3363-68.

• 9/20/18: NP Gaedeke noted Dykman's continuing fatigue caused increased dizziness, and that he had decreased energy and increased cognition struggles at work. AR 3381-86.

• 9/24/18: Dr. Doak noted fatigue and cognitive fogginess and that Dykman's main MS symptoms were fatigue, numbness of the right arm and leg and mental cloudiness. AR 3398-3402.

• 12/26/18: Dr. Smoot documented fatigue continued to be an issue. AR 3296. Dykman's MFIS score of 41 indicated he was fatigued (AR 3979, 12/2618 column) and he had difficulty with short-term memory recall. AR 3296.

• 12/27/18: Dr. Doak stated fatigue, numbness in his right arm and leg, and mental cloudiness were Dykman's main MS symptoms. AR 3404.

• 2/18/19: Dr. Doak noted Dykman was not working due to fatigue. Fatigue, right arm and leg numbness, and mental cloudiness were the main symptoms. AR 3394-96.

• 3/6/19: NP Gaedeke noted fatigue was an ongoing issue regarding "maintaining gainful employment." AR 4821.

Megan E. Glor, Attorneys at Law
707 NE Knott Street, Suite 101
Portland, OR  97212
503-223-7400

• 3/26/19: Dr. Smoot stated Dykman was unable to work due to visual blurriness and persistent fatigue. He had continued issues with short-term recall and intractable fatigue. AR 3976-80.

• 4/1/19 and 7/29/19: Dr. Doak stated MS is a chronic medical problem. Dykman's main symptoms were fatigue, numbness in right arm and leg and mental cloudiness. AR 666, 661-62.

• 8/8/19: Dr. Smoot documented Dykman had more fatigue, continued short-term recall issues and slowed thought processing, with fatigue secondary to MS. He also had untreated obstructive sleep apnea and depression. AR 2601-06.

• 3/27/19: NP Gaedeke documented Dykman's significant physical and cognitive fatigue, symptoms that prevented gainful employment. AR 4864.

• 9/16/19: Dr. Smoot assessed progressive, disabling physical fatigue, cognitive dysfunction and visual disorder. AR 4611.

Dr. Johnkutty also ignored Ms. Driver's attestation to Dykman's severe fatigue and need for "12-14 hours of sleep or rest per day" and inability to "do anything or go anywhere for days at a time." AR 858. Dr. Johnkutty listed Ms. Driver's statement as one of the documents she "reviewed" (AR 4004-05), but ignored this material evidence of disability in her analysis. Likewise, she dismissed Dykman's description of his severe, worsening fatigue and cognitive issues that left him unable to program a computer and needing 12 hours of sleep to "do the bare minimum required to make it through the day." AR 859. Dr. Johnkutty acknowledged his fatigue and cognitive problems, but dismissed the additional corroborating evidence in these statements that they were disabling. AR 4004-09. *See* pp. 18-19, *supra* (addressing *Laurie*, 2017 U.S. Dist. LEXIS 35430).

Dr. Johnkutty ignored the medical literature, which confirms fatigue occurs in about 80% of MS patients and can significantly interfere with function, and that it may be the most prominent symptom in a person who otherwise has minimal activity limitations. Indeed, the literature confirms MS patients may suffer the very symptoms Dykman reported: numbness or tingling, vision problems, dizziness, tremor. It confirms more than 50 percent of MS patients

suffer cognitive changes (a range of high-level brain functions, including information processing, learning and remembering new information, organizing, problem-solving, focus/attention) and that depression is a common MS symptom. AR 860-63. As a neurologist, Dr. Johnkutty would know MS inflammatory lesions occur continuously, even during remission, and that MRIs do not clearly reveal cortical demyelination or axonal injury in MS, that inflammation of the optic nerve may cause blurred vision, and that brain lesions may cause fatigue, cognitive impairment, and affective disorders (AR 2322-24), all of which Dykman experienced.

### c. Dr. Johnkutty Ignored, Misstated and Dismissed Material Evidence of Disability in Her Three Addendums.

In a back and forth exchange, Dykman responded to Dr. Johnkutty's review (AR 4004-09) and her three addendums. *See* AR 5552-55, 4168-70, 5550-51 (1/28/20, 3/9/20, and 4/30/20 addendums) and AR 1313-38, 3768-90, 3793-97 (Dykman's 2/28/20, 4/9/20 and 5/21/20 responses). In her first two addendums, Dr. Johnkutty mistakenly reasserted that Dykman's MS had been stable since 2017, based on his MRIs. AR 5553, 4169. She mistakenly asserted he did not have an afferent pupillary defect (on his 6/20/14 exam, Dr. Smoot found Dykman had a "likely left afferent pupillary defect" (AR 2645)) and that his 12/26/18 MFIS score of 40 did not indicate fatigue. *Id. See* AR 3979 (12/26/18 MFIS score of 41 indicated fatigue ("Fatigued" "38-84)).

In her third addendum, Dr. Johnkutty acknowledged Dr. Smoot's description of Dykman's MS progression in his March 27, 2020 letter, as documented by MRIs, but dismissed this information asserting "[t]hough Dr. Smoot notes that the claimant now has lesions in his cervical and thoracic spine as well as his left optic nerve, there were no MRI reports provided with the letter" and no "additional medical evidence provided." AR 5551. She then asserted her "opinion has not changed as there was no new medical evidence provided." *Id.*

**Plaintiff's Motion for Judgment Pursuant to
Fed. R. Civ. P. 52(a) - Page 32 of 35**

Megan E. Glor, Attorneys at Law
707 NE Knott Street, Suite 101
Portland, OR  97212
503-223-7400

However, Dr. Johnkutty had documented in her prior 1/28/20 addendum that

"**Documents reviewed**" included "1/16/2020 John Shaw Note **with references.**" AR 5553

(emphasis added). The "1/16/20 John Shaw Note" was counsel's 21-page letter (AR 2300-20),

and the "references" were eight enclosures, including Dykman's MRI reports. *See* AR 2583,

2720-22, 2736-38, 2744, 2751, 2769-70, 2788, 2852-53, 2868, 2884-86. Shaw's letter not only

enclosed the MRI reports, it discussed them, on pages 8, 9, 10 (AR 2307-09), and (in great

detail) on 14-15 (AR 2313-14). Dr. Johnkutty failed to investigate.

Dr. Johnkutty also dismissed information Dr. Smoot provided in his March 27, 2020,

letter. He explained that Dykman's MS had progressed in severity, that his initial disabling

symptoms involving vision difficulties (blurriness, diplopia, difficulty focusing, difficulty

reading a computer screen) now included fatigue and cognitive dysfunction, that he continued to

experience intermittent weakness, dizziness/vertigo, sensory disturbances of the lower

extremities, extension tremors, and dry eyes that contributed to his disability, that his vision had

improved slightly, but that he was still limited to 1-2 hours/day using the computer, and that

currently, he was primarily disabled by ongoing fatigue and cognitive dysfunction. AR 3791.

LINA's final May 2020 letter (AR 3806-10) reaffirming its claim denial was fraught with

errors, as it simply parroted Dr. Johnkutty's flawed Review (AR 4004-09) and addendums (AR

5552-55, 4168-70, 5550-51); perpetuated her incorrect assertions; and ignored the medical

evidence of Dykman's disabling conditions. LINA asserted:

> Records show that there are no limiting complaints of the optic nerve, and no
> complaints on neurological exam for an APD (afferent pupillary defect). There
> are multiple causes of fatigue and on the MFIS-Modified Fatigue Impact Scale
> score he had no fatigue on December 26, 2018. In addition, his MRI scans were
> stable without worsening disease burden. He was not documented to take naps
> during the day between activities based on the documentation. Therefore, there
> are no restrictions or limitations from a neurological point of view.

Megan E. Glor, Attorneys at Law
707 NE Knott Street, Suite 101
Portland, OR 97212
503-223-7400

AR 3809. LINA accepted Dr. Johnkutty's reviews at face value, without making any effort to see if they accurately reflected Dykman's medical record or if they were consistent with the medical literature. AR 3806-10. LINA's denial decision was erroneous and arbitrary because it ignored, misstated and dismissed the credible record.

### C.  LINA Should Be Ordered to Approve and Pay Dykman's Disability Claim.

The record establishes that Dykman is disabled from his sedentary occupation by MS, a severe, progressive, incurable disease, primarily by fatigue and cognitive dysfunction. Because sedentary occupations have the least exertional demands, there is no reasonable basis for Dykman's claim to be remanded to LINA to determine if he is disabled under the "any occupation" disability standard. *See Gorena, supra,* 2018 U.S. Dist. LEXIS 104071 at *21-22 ("Having been satisfied that Plaintiff has proven her inability to discharge the material duties of her sedentary position at Boeing [due to MS] and established beyond question the lifelong and steadily deteriorating nature of her medical condition, the Court clarifies Plaintiff's rights to future Plan benefits by finding that she is entitled to continuing LTD benefits under the 'any reasonable occupation' section of the Plan."); *Rios v. Unum Life Ins. Co.,* 2020 U.S. Dist. LEXIS 233953 at *24-25 (C.D. Cal. Dec. 10, 2020) (**remand** to determine an entitlement to **benefits** under the 'any occupation' standard is inappropriate where plaintiff has argued for **benefits** under both the 'own occupation' and 'any occupation' standards and the evidence supports plaintiff's inability to perform either her 'own occupation' or 'any occupation' under the policy. Therefore, the Court declines to **remand** this case to Unum to conduct an 'any occupation' evaluation."). *Petrusich v. Unum Life Ins. Co. of Am.,* 984 F. Supp.2d, 1112, 1124 (D. Or. 2013) (concluding the situation was not one where the "Plan Administrator failed to apply the plan provisions properly," but rather, the decision was the "result of a superficial and cursory review

of the record and is unsupported by the record" and holding that an "award of benefits is appropriate" as the insurer should not be permitted to "have another bite of the apple").

Accordingly, Dykman requests this Court order LINA to approve and pay Dykman's claim through the date of judgment and to order that LINA continue to pay the claim under the LTD Policy's "any occupation" definition of disability so long as he remains disabled under the terms of the LTD Policy.

## V.  CONCLUSION

Dykman respectfully requests this Court grant his Motion for Judgment under FRCP 52 and order LINA to approve and pay his LTD claim.

DATED:  February 12, 2021

Respectfully submitted,

*s/ John C. Shaw*
John C. Shaw, OSB No. 065086
Email: john@meganglor.com
*s/ Megan E. Glor*
Megan E. Glor, OSB No. 930178
Email: megan@meganglor.com