# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF OREGON

| | |
|---|---|
| **NATHAN DYKMAN**, | Case No. 3:20-cv-01547-IM |
| Plaintiff, | **FINDINGS OF FACT AND CONCLUSIONS OF LAW** |
| v. | |
| **LIFE INSURANCE COMPANY OF NORTH AMERICA**, | |
| Defendant. | |

John C. Shaw and Megan E. Glor, Megan E. Glor, Attorneys at Law, 707 NE Knott Street, Suite 101, Portland, OR 97212. Attorneys for Plaintiff.

D. Michael Reilly, Lane Powell, PC, PO Box 91302, Seattle, WA 98111-9402. Brian T. Kiolbasa, Lane Powell, PC, 601 SW Second Avenue, Suite 2100, Portland, OR, 97204-3158. Attorneys for Defendant.

**IMMERGUT, District Judge.**

This matter comes before the Court on the parties' cross-motions for judgment under Federal Rule of Civil Procedure 52(a). ECF 20; ECF 22. The Employee Retirement Income Security Act ("ERISA") provides that an ERISA plan "participant" may bring a civil action in federal court "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the

plan[.]" 29 U.S.C. § 1132(a)(1)(B). Plaintiff Nathan Dykman brings this action to challenge the decision made by Defendant Life Insurance Company of North America ("LINA") denying him long-term disability ("LTD") benefits under the Group Long Term Disability Insurance Policy ("Plan") provided by his employer, Providence St. Joseph Health ("Providence"). ECF 20 at 6.

Dykman, who worked as a software developer for Providence, argues that he is disabled because of visual problems, cognitive dysfunction, and fatigue caused by relapsing remitting multiple sclerosis ("MS"), an incurable disease with which he was diagnosed in 2011. *Id.* Defendant argues that the medical evidence does not establish disability under the plan because Dykman's visual problems and fatigue did not render him "functionally limited" during the applicable period. ECF 22 at 1–2. Having reviewed the administrative record, this Court finds that LINA's reviewing doctors misread or selectively read the medical records, failed to examine Dykman or consult his treating physicians, overlooked medical literature presented to them, and ignored evidence of Dykman's subjective experience. For these reasons, this Court concludes that Dykman has a right to LTD benefits under the Plan. That said, Dykman has not shown that he meets the criteria for continued benefits after March 7, 2021 under the stricter standard required by the Plan after two years. The case is remanded to the Plan administrator solely to determine whether he is eligible for continuing benefits. Dykman's motion for judgment on the pleadings is GRANTED IN PART and DENIED IN PART; LINA's cross-motion for judgment on the pleadings is GRANTED IN PART and DENIED IN PART.

## STANDARDS

"ERISA does not set out the appropriate standard of review for actions under § 1132(a)(1)(B) challenging benefit eligibility determinations." *Firestone Tire & Rubber Co. v.*

*Bruch*, 489 U.S. 101, 109 (1989). The Supreme Court has filled this gap with a simple test: if the

benefits plan provides the plan administrator with "*discretionary authority* to determine

eligibility for benefits," review is for abuse of discretion. *Metro. Life Ins. Co. v. Glenn*, 554 U.S.

105, 111 (2008) (quoting *Firestone*, 489 U.S. at 115). Otherwise, "[p]rinciples of trust law

require courts to review a denial of plan benefits under a *de novo* standard." *Id.* (internal

quotation marks and citation omitted). Here, the parties agree that de novo review is appropriate.

[ECF 20 at 10; ECF 22 at 9; *see also Wise v. Maximus Fed. Servs.*, 478 F. Supp. 3d 873, 877

(N.D. Cal. 2020) (evaluating an ERISA benefits denial case de novo when the parties did not

dispute the standard of review).[1]

    In reviewing de novo a benefit eligibility determination, the court conducts "a trial on the

administrative record, which permits the court to make factual findings, evaluate credibility, and

weigh evidence." *Rabbat v. Standard Ins. Co.*, 894 F. Supp. 2d 1311, 1314 (D. Or. 2012); *see*

*also Kearney v. Standard Ins. Co.* 175 F.3d 1084, 1095 (9th Cir. 1999) ("The district judge will

be asking . . . whether [the plaintiff] is disabled within the terms of the policy. In a trial on the

record . . . the judge can evaluate the persuasiveness of conflicting testimony and decide which is

---

[1] Parties have requested oral argument. Under LR 7-1(d), the Court finds that it would not be
assisted by oral argument and decides this matter on the administrative record and the parties'
briefing. *See Mulhern v. Life Ins. Co. of N. Am. et al.*, No. 6:17-cv-01758-AA, ECF No. 29-39
(D. Or. 2021) (granting plaintiff's motion for judgment on the administrative record without oral
argument); *see also Galloway v. Lincoln Nat'l Life Ins. Co.*, No. C09-1479JLR, 2011 WL
1599136, at *1 (W.D. Wash. April 28, 2011) (deeming "oral argument unnecessary" to grant
cross motions for summary judgment and judgment on the administrative record in an ERISA
case); *Hawley v. Life Ins. Co. of N. Am.*, No. CIV.08-079 FCD/KJM, 2009 WL 10694819, at *1
n.1 (E.D. Cal. June 5, 2009) ("Because oral argument will not be of material assistance, the court
orders these matters submitted on the briefs."); *Fisher v. Aetna Life Ins. Co.*, No. CIV 07-614-
TUC-CKJ, 2009 WL 10695206, at *1 (D. Ariz. Feb. 20, 2009) ("The Court finds that it would
not be assisted by oral argument.").

PAGE 3 – FINDINGS OF FACT AND CONCLUSIONS OF LAW

more likely true."). Under Fed. R. Civ. P. 52(a), the Court issues the following findings of fact and conclusions of law.

## DISCUSSION

I.    **Findings of Fact**

A.  **The LTD Plan and Procedural History**

1.  In May 2017, Dykman began working at Providence as a software developer. Administrative Record ("AR") 4204. A software developer at Providence "[r]esearches, designs, and develops computer software systems, in conjunction with hardware product development." AR 5562. Tasks include analyzing software requirements to determine design feasibility; consulting with hardware engineers and other engineering staff to evaluate the interface between hardware and software; formulating and designing software systems using scientific analysis and mathematical models; developing and directing software system testing procedures, programming, and documentation; and consulting customers about the maintenance of software systems. *Id.* Providence designates "Vision for Close-Up Work" as a continual demand for its software engineers, meaning five and a half to eight hours per day. AR 5570.

2.  Dykman was a Plan participant in the Benefits Class 12[2], insured and administered by LINA under a group policy setting out the Plan's substantive terms for receiving LTD benefits. AR 45–165.

_____

[2] Class 12 includes "[a]ll active Employees of Providence Health & Services classified as Staff regularly working the required number of hours to qualify for benefits in the Group's Long-term Disability Plan." AR 49. The parties agree that Dykman is a Class 12 Plan participant. *See* ECF 20 at 8; ECF 22 at 2.

3. Dykman left work on September 8, 2018 "due to Multiple [S]clerosis and vision difficulties and sought treatment." AR 4357. In January 2019, LINA received Dykman's application for LTD benefits under the Plan.[3] AR 5101.

4. The Plan provides that an employee is considered disabled "if, solely because of Injury or Sickness, he or she is . . . unable to perform the material duties of his or her Regular Occupation; and . . . unable to earn 80% or more of his or her Indexed Earnings from working in his or her Regular Occupation." AR 84. After Disability Benefits have been payable for twenty-four months, the employee is only considered disabled if he or she is "unable to perform the material duties of any occupation for which he or she is, or may reasonably become, qualified based on education, training or experience; and . . . unable to earn 60% or more of his or her Indexed Earnings." *Id*.

5. The Plan defines "regular occupation" as

> [t]he occupation the Employee routinely performs at the time the Disability begins. In evaluating the Disability, the Insurance Company will consider the duties of the occupation as it is normally performed in the general labor market in the national economy. It is not work tasks that are performed for a specific employer or at a specific location. AR 156.

6. The Plan requires that an employee meet the disability standard throughout a 180-day "elimination period." AR 84, 142.

7. On April 5, 2019, LINA denied Dykman's LTD claim. AR 4356. In doing so, LINA relied on a review of Dykman's medical records on file by two "Medical Directors," one specializing in Neurology (Dr. Lawrence Teitel) and the other specializing in Ophthalmology (Dr. Houman Vosoghi). AR 1311–12, 4353–55, 4358.

---

[3] There is evidence in the record that Dykman received short-term disability benefits from another insurer for the maximum six-month benefit period. AR 190. Neither party argues that this has any bearing on his eligibility for LTD benefits or should affect the amount, if any, to which Dykman is entitled. *See generally* ECF 20; ECF 22.

PAGE 5 – FINDINGS OF FACT AND CONCLUSIONS OF LAW

8. On October 1, 2019, Dykman filed an appeal. AR 180.

9. LINA obtained the opinion of an independent, board certified neurologist (Dr. Suja Johnkutty) to assess the appeal. AR 4004–09. On December 10, 2019, LINA notified Dykman that it intended to uphold its decision, provided Dr. Johnkutty's opinion, and requested Dykman's response. AR 4000–09.

10. After Dykman requested an extension of time to respond, which LINA granted, a long back-and-forth ensued in which Dykman responded to Dr. Johnkutty's initial review, Dr. Johnkutty produced three addenda on which LINA relied, and Dykman responded to those addenda. *See* AR 5552-55, 4168-70, 5550-51 (Dr. Johnkutty's January 28, 2020, March 9, 2020, and April 30, 2020 addenda); AR 1313-38, 3768-90, 3793-97 (Dykman's February 28, 2020, April 9, 2020, and May 21, 2020 responses). Throughout the correspondence, Dykman maintained that because Dr. Johnkutty's analysis was flawed and so an adverse decision based on the analysis would be flawed as well. *See* AR 3795 ("Dr. Johnkutty's Medical File Review Addendum 3, like her initial Medical File Review and previous two Addendums, is flawed.")

11. On May 22, 2020, LINA issued its final determination denying Dykman's appeal. AR 3806. This suit followed.

**B. Dykman's Medical History**

12. Dykman was born in 1974. AR 834. In 2011, Dr. Kyle Smoot diagnosed Dykman with MS when MRIs revealed at least ten lesions in the brain and possibly four lesions in the cervical spine. AR 834, 837. There was some suggestion of progression since 2010, when an earlier MRI revealed one lesion. AR 837.

13. In July 2013, MRIs of Dykman's cervical and thoracic spines showed the cervical spinal cord lesions and a new thoracic spinal cord lesion. AR 2736, 2738. In January 2015, a brain MRI showed the brain lesions, stable in size and number. AR 2751. That MRI showed an increased optic nerve signal bilaterally, but it may have been artifactual. *Id*. An April 2016 MRI showed "[c]erebral white matter lesions, which support the clinical diagnosis of multiple sclerosis," but showed no sign of "new lesion or active demyelination." AR 2769.

14. On November 11, 2014, on Dr. Smoot's referral, Dykman saw ophthalmologist Dr. Sonal Dave. AR 1449–50. Dr. Dave noted that Dykman had dry eyes, but that it "affect[ed] neither distance or near vision." Dykman also had a history of floppy eyelid syndrome ("FES"), dry eyes, and keratitis in both eyes. AR 1445. Dr. Dave's impression was "tear film insufficiency" and ordered Dykman to return in two weeks for a cornea check and refraction and one year for follow-ups. AR 1450. Dr. Dave noted that Dykman was using Restasis in both eyes and that he was doing well on his current medication regimen. *Id*. On November 20, 2014, Dr. Dave noted that Dykman's dry eyes were now "affect[ing] *both* near and far vision" but that the condition was improving. AR 1441 (emphasis added). In April 2016, Dykman's dry eyes were "[s]table on current meds per pt." and Dr. Dave noted that the condition was not affecting near or far vision. AR 1435, 1440.

15. By March 2, 2017, Dykman's dry eyes were again affecting near and far vision. AR 1429. Dr. Dave's impression was dry eye syndrome of bilateral lacrimal glands. AR 1434. On March 28, 2017, Dr. Dave noted that the condition was worsening, causing irritation, burning, grittiness, and soreness; Dykman had been taping his eyelids closed at

night. AR 1422. Dr. Dave placed punctal plugs in Dykman's eyes "to alleviate the dry and irritated eye symptoms." AR 1422, 1424–27.

16. In April 2017—Dykman's last medical appointment before he started working at Providence in May 2017—Dr. Smoot noted "no new neurologic issues." AR 3345. At that time, Dykman's symptoms were dry eyes, rare episodes of vertigo, disturbances in the feet, a high-frequency tremor with extension, and reduced vibration in the big toes. AR 3345–47.

17. By May 2018, Dykman was continuing to work at Providence but "ha[d] missed some work [due to] fatigue and increase in allergies." AR 3356. Dykman was taking Tecfidera[4] with excellent adherence. AR 3357. Dr. Smoot did not note any changes in Dykman's vision, but noted that his dry eyes persisted. *Id*. While Dykman's vertigo had ceased, his high-frequency tremor persisted and vibration remained minimally reduced in the right big toe. AR 3357, 3359. Dr. Smoot noted a Modified Fatigue Impact Score ("MFIS") of 40, indicting fatigue. AR 3359. Dr. Smoot noted that the fatigue could have been caused by MS or Dykman's sleep apnea.[5] AR 3360.

18. In July 2018, Dykman was evaluated by Nurse Practitioner ("NP") Leah Gaedeke who again noted Dykman's dry eyes and that the heat was "worsen[ing] fatigue and mental clarity" and causing lightheadedness. AR 3363–64. NP Gaedeke assessed a "pseudo

---

[4] Tecfidera is a drug used to treat relapsing forms of MS which Dykman had been taking since August 2013. *See* AR 3416.

[5] Based on the parties' references to sleep apnea and corresponding references to the record, the court understands references in the medical record to "OSA" to mean "obstructive sleep apnea." *See* ECF 20 at 13 (quoting AR 3360) ("he has OSA [obstructive sleep apnea], which is not being treated" (alteration in brief)); ECF 22 at 13 (quoting AR 1709) ("he has [sleep apnea] which is not being treated" (alteration in brief)).

flare" of Dykman's MS and noted that he was missing work, but also noted that the

fatigue may be caused by sleep apnea. AR 3363, 3368.

19. On August 8, 2018, Dykman returned to see Dr. Dave. His dry eyes were affecting both

near and far vision and he was having trouble focusing from near to far. AR 1403. Dr.

Dave noted that the condition was mild, but that irritation had not gone down "sin[c]e

[the] smoke has been getting better." *Id*.

20. On September 8, 2018, Dykman went on a leave of absence from work at Providence.

AR 4615.

21. On September 20, 2018, Dykman saw NP Gaedeke who noted increased dizziness,

fatigue, and struggles with cognition. AR 3380–81. NP Gaedeke wrote that Dykman was

stressed as a result of work, which caused pseudo-flares of his MS. AR 3385. NP

Gaedeke noted that "MS may be contributing" to Dykman's fatigue and sleep apnea was

"definitely contributing." *Id.*

22. On September 24, 2018, Dr. Melanie Doak, Dykman's primary care physician, evaluated

him and noted fatigue and cognitive fog. AR 3398. Dr. Doak noted that Dykman's sleep

was getting better and he was using an oral appliance for his sleep apnea. *Id*. Dr. Doak

noted Dykman's main MS symptoms as "fatigue and numbness in the [right] arm and

[right] leg and mental cloudiness." AR 3399. Dr. Doak also noted Dykman's dry eye

syndrome, "etiology unclear." AR 3402.

23. On October 31, 2018, Dr. Dave remarked that Dykman's dry eye condition was

"worsening." AR 5338. The condition was affecting his intermediate vision, causing

diplopia when using a screen, and making it difficult to work. *Id*. Dr. Dave performed a

slit lamp examination and observed "1/2+ central SPK." AR 5342. Superficial punctate

keratitis ("SPK") is "[t]he most common sign of corneal inflammation" and "can be caused by and associated with numerous ocular conditions, most commonly dry eye disease." AR 580.

24. On November 20, 2018, Dr. Dave noted that the condition was "stable" and "affect[ing] neither distance or near vision" but that Dykman's eyes felt "goopy and irritated." AR 5344. Dr. Dave noted "1/2+ SPK" in Dykman's right eye and "2+ SPK" in his left, which was "more than before." AR 5347.

25. On December 11, 2018, Dr. Dave noted that the condition was "improving, [but] up and down." AR 5349. This time, she noted only "trace SPK" in Dykman's right eye, but still "2+" in his left. AR 5353. Dr. Dave remarked that the variable levels of SPK in each eye could be causing double vision. *Id*.

26. On December 27, 2018, Dykman's vision was still blurry, though the dryness had slightly improved. AR 5355. Dr. Dave observed "trace SPK" in the right cornea and "1/2+" in the left. AR 5358.

27. On December 26, 2018, Dr. Smoot noted that Dykman had "not been able to work since September secondary to difficulty reading the computer screen – develops blurriness which can cause diplopia . . . (vision did worsen)." AR 3295. At that point, Dykman reported that he felt "like he ha[d] one good hour in the morning," and that if he looked at a computer screen any longer, he would develop headaches. AR 3296. Dr. Smoot reported that Dykman was "[d]epressed[,] frustrated with vision[, and] not able to work." *Id*. He also had difficulty with short-term memory recall, unsteadiness and right foot weakness, and an MFIS of 41 showing fatigue. AR 3296, 3979 (March 26, 2019 medical report noting December 26, 2018 MFIS score). Specifically citing Dykman's visual

difficulties, Dr. Smoot assessed that "he is not able to work" but at that time said that MS was not the cause of his visual issues. AR 3300.

28. On December 27, 2018, Dykman saw Dr. Doak. AR 3403–07. Dr. Doak noted that Dykman's dry eye condition had worsened over the past three months and caused "disability due to not being able to sit in front of a computer." AR 3403. Dr. Doak continued to note Dykman's MS symptoms as fatigue, numbness in the right arm and leg, and mental cloudiness. AR 3404. Dr. Doak mentioned that Dykman was having his testosterone level checked as a possible cause of his symptoms, but she felt it was "more likely related to his MS." AR 3405.

29. Throughout February and March 2019, Dykman's healthcare providers continued to note his visual problems, fatigue, and inability to work. Dr. Doak noted that he was "still not working due to fatigue" and explicitly noted that the fatigue was "related to MS." AR 3394, 3396. NP Gaedeke noted that Dykman "ha[d] struggled to work full time for the past few years." AR 4817. She noted "[o]ngoing issues with maintaining gainful employment due to visual struggles, cognitive fatigue, and depression." AR 4821. Dr. Smoot noted in late March that Dykman "continued to have intermittent visual issues which impair his ability to use a computer" as well as "intractable fatigue." AR 3980. Dr. Smoot supported continued disability. *Id*.

30. In a behavioral health questionnaire dated February 21, 2019, Dykman's psychiatrist Dr. Craig Zarling noted Dykman's depression and his inability to work full-time. AR 1300, 1302. But Dr. Zarling wrote that "Mr. Dykman *is not disabled on [the] basis of mental health issues*," rather he "has a depression currently complicating coping with combined health-related concerns and work related problems." AR 1302 (emphasis added). Dr.

Zarling concluded that, "in general[,] Mr. Dykman is able to perform the cognitive and instrumental tasks of his job, but his experience of physical fatigue and lack of stamina, combined with eye discomfort impair his ability to sustain effort on [a] computer screen." AR 1303.

31. On March 13, 2019, Dykman filled out a Disability Questionnaire & Activities of Daily Living. AR 4795–800. Dykman reported: "Due to severe fatigue and other health issues caused by Multiple Sclerosis, I am unable to work a consistent full-time work schedule. I require significant rest because of Multiple Sclerosis and my overall limited capabilities, physical and mental, significantly limit my activities at work and at home. Additionally, I have severe eye issues that prevent the usage of computer screens for the time required for any position requiring the use of a computer or long term reading." AR 4800.

**C.  LINA's Review**

32. Dr. Teitel reviewed Dykman's claim from a neurological perspective. AR 1311–12. On April 1, 2019, Dr. Teitel wrote that "[m]edical documentation [for] Mr. Dykman does not support restriction for work based on visual impairment from dry eyes or MS condition." AR 1312. Dr. Teitel further concluded that "there are no co-limiting conditions which may independently or collectively impact the customer's functionality (co-limiting)." *Id.* In concluding that Drs. Smoot, Dave, and Doak's opinions were "not well supported by medically acceptable clinical or laboratory diagnostic techniques and [are] inconsistent with other substantial evidence in the claim file," Dr. Teitel noted:

    a.  Dr. Smoot's documentation that Dykman has "intact ocular motility, visual fields as well as normal extremity strength, cerebellar coordination, gait and cognition."

    b.  Dr. Dave's documentation, "on multiple occasions," of "intact central visual acuity at near and distance." *Id*.

33. Dr. Vosoghi reviewed Dykman's claim from an ophthalmological perspective. AR 4353–55. On April 4, 2019, he wrote that "the claimant is not functionally limited visually . . . [he] has no current visual findings such as optic nerve involvement." AR 4354. Dr. Vosoghi further noted:

    a.  Plaintiff [or Dykman] "has normal intra-ocular pressures, no fundoscopy abnormality and only dry eye symptoms which can be managed with the current treatment plan." *Id*.

    b.  While "MS can result in flare-ups involving vision with symptoms of diplopia, blurred vision, loss of vision . . . claimant does not present with current flare-up and associated visual defects." *Id*.

34. Dr. Vosoghi then noted medical records from Dr. Smoot (January 3, 2019), Dr. Dave (January 10, 2019 and February 12, 2019), Dr. Doak (February 18, 2019), and NP Gaedeke (March 6, 2019 and March 27, 2019). AR 4354–55. Although Dr. Vosoghi writes that he reached his conclusion "because" of these records, he simply lists their findings and does not explain with what, if anything, he disagrees. *See id*.

**D.  Dykman's Supplemental Filings**

35. After LINA denied his claim, Dykman filed an appeal with new materials appended. AR 180.

36. On top of resubmitting his medical records, Dykman submitted a letter from his mother, AR 420–21, and a personal attestation about his health issues, AR 422. Dykman's mother wrote that Dykman's fatigue and concentration issues had worsened, that he required

PAGE 13 – FINDINGS OF FACT AND CONCLUSIONS OF LAW

more than twelve hours of sleep per day, and that he had developed visual problems that

caused blurry and decreased vision when looking at a computer screen. AR 420–21.

Dykman also attested to fatigue, needing twelve hours of sleep to maintain enough

energy to do basic tasks (*e.g.*, shopping) and "make it through the day," and his desire to

work in his chosen field. AR 422.

37. Dykman also submitted extensive medical literature. AR 423–614. The literature stated,

among other things, that fatigue occurs in about eighty percent of MS patients and more

than fifty percent suffer cognitive issues including an impaired ability to process, learn,

and remember new information and to focus. AR 423, 425, 501. There are no

pharmaceutical treatments for MS-related fatigue. AR 533. MS can also cause blurred

vision and diplopia. AR 424, 487. Finally, the literature cautioned that "it is important to

recognize that the progression of physical and cognitive disability in MS may occur in the

absence of clinical exacerbations." AR 500.

**E.  LINA's Review of Dykman's Appeal**

38. In denying Dykman's appeal, LINA relied on Dr. Johnkutty's Medical File Review. AR

4004–09. Dr. Johnkutty concluded that "there are no restrictions or limitations for vision"

and that "[g]iven the multiple causes of fatigue and that the MFIS . . . had no fatigue on

12/26/18 . . . the records do not support restrictions or limitations." AR 4008. Dr.

Johnkutty did not personally examine Dykman and did not speak with any of Dykman's

treating physicians, though he made two attempts to contact Dr. Smoot. AR 4005.

39. Dr. Johnkutty made these findings as part of her file review:

a.  According to Dr. Smoot's records, Dykman's MFIS on December 26, 2018 did

not reveal fatigue. AR 4006.

b.  There was "evidence of a stable focal lesion in the canalicular segment of the left optic nerve suggesting sequela of demyelinating plaque" as of June 2019. AR 4007. At the same time, Dr. Dave's records showed the condition to be improving, Dr. Smoot's exam did not show an abnormality of the optic nerve, and Dr. Dave did not mention optic neuropathy. AR 4007–08.

c.  Dykman's "persistent fatigue is complicated by multifactorial factors: depression, anxiety, untreated sleep apnea and multiple sclerosis." AR 4008. Dr. Johnkutty specifically noted Dykman's intolerance to a CPAP machine to treat his sleep apnea and his inability to undergo testing because of his anxiety. *Id*.

d.  Dykman's MRI on June 23, 2019 did not show any new or enhancing lesions compared to his May 2017 MRI, signifying that Dykman's MS was stable. *Id*. These MRI scans suggested that there was not "worsening disease burden." *Id*.

40. On January 28, 2020, March 9, 2020, and April 30, 2020, Dr. Johnkutty produced three addenda supporting a finding of no restrictions or limitations. AR 4168–71, 5550–55.

a.  In the January 28 and March 9 addenda, Dr. Johnkutty reasserted that Dykman's MRIs showed that his MS had been stable since 2017. AR 4169, 5553. She also pointed to the lack of "objective complaints on neurological exam for an APD (afferent pupillary defect)" as evidence that there were no restrictions or limitations for vision. *Id*. Dr. Johnkutty again noted that any fatigue Dykman suffered was multifactorial. AR 4168–69, 5553.

b.  In the April 30 addendum, Dr. Johnkutty responded to a letter, dated March 27, 2020, from Dr. Smoot which documented the progression of Dykman's MS from the brain to the cervical spine, left optic nerve, and thoracic spine. AR 5551. Dr.

PAGE 15 – FINDINGS OF FACT AND CONCLUSIONS OF LAW

Johnkutty asserted that "[t]hough Dr. Smoot notes that the claimant now has

lesions in his cervical and thoracic spine as well as his left optic nerve, there were

no MRI reports provided with the letter and no diagnostic or office treatment

notes with additional medical evidence provided. Therefore, my opinion has not

changed as there was no new medical evidence provided." *Id.*

41. On May 22, 2020, LINA upheld its prior decision denying Dykman's claim. AR 3806.

The denial letter cited the "evaluat[ion] by an independent medical doctor, Board

Certified in Neurology," *i.e.*, Dr. Johnkutty. AR 3807.

**II.    Conclusions of Law**

**A. Standards**

1. ERISA provides that a plan "participant" may bring a civil action in federal court "to

recover benefits due to him under the terms of his plan, to enforce his rights under the

terms of the plan, or to clarify his rights to future benefits under the terms of the plan."

29 U.S.C. § 1132(a)(1)(B). *See Metro Life Ins. Co.*, 554 U.S. at 108 (ERISA "permits a

person denied benefits under an employee benefit plan to challenge that denial in federal

court").

2. As discussed above, the parties agree that de novo review is appropriate in this case.

"When conducting a de novo review of the record, the court does not give deference to

the claim administrator's decision, but rather determines in the first instance if the

claimant has adequately established that he or she is disabled under the terms of the

plan." *Muniz v. Amec Constr. Mgmt., Inc.*, 623 F.3d 1290, 1295–96 (9th Cir. 2010).

3. When a district court "reviews a plan administrator's decision under the de novo

standard of review, the burden of proof is placed on the claimant." *Id.* at 1294. The

claimant must prove by a preponderance of the evidence that he or she was disabled

under the plan. *See Armani v. Nw. Mut. Life Ins. Co.*, 840 F.3d 1159, 1162–63 (9th Cir.

2010).

**B.  Dykman is Totally Disabled**

4.   To qualify as "totally disabled" under the Plan, Dykman must show that he is (1) unable

to perform the material duties of his regular occupation as a software developer and (2)

unable to earn 80% or more of his indexed earnings from working as a software

developer. AR 84.

5.   The parties have not submitted evidence or argument about Dykman's ability to earn

80% or more of his indexed earnings, so the sole issue is whether he can perform the

material duties.

6.   The health care professionals who have personally examined and treated Dykman

support disability. On March 26, 2019, Dr. Smoot wrote that he supported Dykman's

continued time off from work and was still completing paperwork. AR 3980. Dr. Smoot

reiterated his support on August 8, 2019. AR 3989. On March 27, 2019, NP Gaedeke

wrote that she supported Dykman's continued time off from work. AR 4864. While Dr.

Doak did not use the word "support," she noted throughout 2018 and 2019 that Dykman

was out of work, on short-term disability, and that he had disability work that needed

completing. *See, e.g.*, AR 3394, 3396, 3398, 3402. At no point did Dr. Doak suggest that

she thought Dykman should return to work or that she disagreed with Dr. Smoot and NP

Gaedeke's assessment. This evidence alone is persuasive evidence that Dykman is

totally disabled. *See Salomaa v. Honda Long Term Disability Plan*, 642 F.3d 666, 676–

79 (9th Cir. 2011) (favoring treating physicians' conclusions that claimant was disabled

supported finding that he was disabled under the plan terms over contrary conclusions by insurance company's non-examining physicians).

7. LINA argues that Dykman has not proved by a preponderance of the evidence that he was disabled throughout the elimination period—September 8, 2018 to March 7, 2019— and therefore has not proved that he was qualified under the Plan. ECF 22 at 10. As it did in the initial and post-appeal benefits denial, LINA relies on the opinions of three reviewing physicians. But each of those reports misstates or selectively cites the relevant medical records, and none address the subjective evidence of disability.

8. Dr. Teitel noted that on October 8, 2018 and November 20, 2018, Dr. Dave found that Dykman's dry eyes "affect neither distance or near vision and condition is stable." AR 1311. Dr. Teitel glosses over the fact that Dr. Dave found on October 31, 2018— between the two dates he cited—that Dykman's dry eyes *were* affecting near and distance vision; that Dykman's eyes were "goopy and irritated" even on November 20, 2018; and that on December 11, 2018 Dr. Dave observed that the condition was "up and down." AR 5344, 5349. There was also evidence that Dykman's dry eyes intermittently affected his near and distance vision as early as 2014 and continuing through 2017. AR 1429, 1441, 1445.

9. Dr. Teitel further noted that, on February 12, 2019, Dr. Dave recorded "normal appearance of righteye conjunctiva and only trace/+1 injection of left conjunctiva." AR 1311. This is a misstatement of the medical record. On February 12, Dr. Dave noted trace (not normal) right conjunctiva and 1/2+ (not trace/+1) left conjunctiva; she also observed ABMD in both corneas. AR 2901. ABMD, or Anterior Basement Membrane Dystrophy, is a corneal disorder that can "present with a variety of symptoms, including

. . . blurred vision." AR 1011. Dr. Teitel does not address ABMD anywhere in his review. Moreover, as with the dry eyes overall, Dykman's SPK varied from examination to examination. Dr. Dave observed Dykman's SPK in at least eight visits—*see* AR 2901–02, 5043, 5048, 5342, 5347, 5353, 5358–59, 5365—but Dr. Teitel only mentions one.

10. Dr. Teitel also cites Dr. Smoot's exam on December 26, 2018, which noted that Dykman's visual fields were full and that he had full ocular motility. AR 1311. While these are accurate statements, they are incomplete. In the same exam, Dr. Smoot wrote that Dykman "has not been able to work since September secondary to difficulty reading the computer screen – develops blurriness which can cause diplopia;" that he "[f]eels like he has one good hour in the morning[, t]hen if he continues to look at a computer, he will develop headaches"; that he was "frustrated with [his] vision"; and that "dry eyes result[] in difficulty focusing." AR 3295–96, 3300.

11. Dr. Vosoghi's review notes that Dykman "has no current visual findings such as optic nerve involvement, and has no established visual field loss, visual acuity loss to the extent to impact functioning." AR 4354. Dr. Vosoghi's assessment of no visual findings conflicts with the ample evidence of ABMD, keratitis, and floppy eyelid syndrome ("FES"). AR 1445.

12. Dr. Vosoghi also claims that Dykman has "normal intra-ocular pressures" ("IOP"). AR 4354. But Dr. Dave noted increased intra-ocular pressure on both October 31 and December 27, 2018. AR 5338–42, 5355–58.

13. Dr. Vosoghi's claim that Dykman's dry eye symptoms "can be managed with the current treatment plan," AR 4354, is contradicted by the evidence that the condition was waxing and waning despite treatment, AR 5061.

14. Dr. Vosoghi admits that "MS can result in flare-ups involving vision with symptoms of diplopia, blurred vision, [and] loss of vision." AR 4354. But Dr. Vosoghi also asserts that Dykman "does not present with current-flare-up and associated visual deficits. *Id.* This assertion is flawed for two reasons. First, NP Gaedeke had assessed a "pseudo flare" of Dykman's MS brought on by summer heat and work-related stress. AR 3368, 3380. Second, the visual problems associated with MS can be brought on in the absence of a relapse "by fatigue, an increase in temperature, stress, and infection." AR 1037–38.

15. Dr. Vosoghi then concludes that the treating providers' opinions were "not well supported by medically acceptable clinical or laboratory diagnostic techniques and *is inconsistent with the other substantial evidence in the claim file.*" AR 4354 (emphasis added). Although purportedly in support of this position, Dr. Vosoghi lists medical records from Dykman's providers, the records he references do not actually contradict a disability finding, but rather support a disability finding. *Id.*

16. Dr. Johnkutty's report also concludes that Dykman was not disabled. AR 4008. But Dr. Johnkutty's report also misstates or mischaracterizes the evidence. Dr. Johnkutty writes that, "[a]ccording to Dr. Smoot's records[,] his score was noted not to be fatigued on 12/26/18 and he was not tested afterwards." AR 4006. But Dr. Smoot's records actually indicate that Dykman's MFIS on December 26, 2018 was 41. AR 3979. It is true that the report says, "Not Fatigued (0-37)," but this is likely an error because an MFIS of 41 is in

the category of fatigued. *Id*. For example, the previous entry noted on the same chart, from May 24, 2018, shows an MFIS of 40 and has the notation "Fatigued (38-84)." *Id*.

17. Dr. Johnkutty also characterizes a statement made by Dykman on August 8, 2019 as follows: "he stated *he was able to use the computer* and *some of his vision has improved*." AR 4008. But what Dykman really said, as recorded by Dr. Smoot, was that he was "able to use the computer some. However, he is still limited." AR 2606. Dr. Johnkutty's characterization gives the impression that Dykman's visual problems were no longer affecting his ability to use the computer at all; Dykman's actual statement tracks his earlier disability—using the computer for some amount of time before his visual problems and headaches made it impossible to continue. *Compare id*. *with* AR 3295–96 (reporting similar symptoms in December 2018) .

18. Dr. Johnkutty also commented that Dykman's fatigue was complicated by multifactorial factors, including depression, anxiety, and untreated sleep apnea along with multiple sclerosis. AR 4008. Dr. Johnkutty noted that a contributing factor to Dykman's fatigue was "the obstructive sleep apnea and the anxiety untreated as the claimant is not able to use the CPAP machine." *Id*. While there was evidence in the record that Dykman did not tolerate the CPAP machine, *see, e.g.*, AR 3398, Dr. Johnkutty ignores the evidence that Dykman's sleep was improving and that he had been using an oral appliance since September 2018, *id.*, but that his fatigue persisted, AR 1362, 3391–92, 3404. In *Gorena v. Aetna Life Ins. Co.*, No. C17-532 MJP, 2018 WL 3008873, at *6 (W.D. Wash. June 15, 2018), an insurance company's reviewing doctor "attributed [the claimant's] difficulties walking and balancing to her excessive weight . . . characteristic of an overall pattern on the part of [the insurer's] analysis of assigning [the claimant's]

negative symptoms to everything *except* her MS (i.e., her weight, her (former) substance

abuse and her psychological/behavioral problems).” Dr. Teitel’s analysis here is similar.

19. Dr. Johnkutty closed his report by noting that Dykman’s “MRI scans were stable

without worsening disease burden either.” AR 4008. Again, Dr. Johnkutty errs just like

the reviewing doctor in *Gorena* who “justified [his] conclusion by cherry-picking every

phrase or sentence from the materials which was indicative of some aspect of [the

claimant’s] condition that was ‘stable’ or ‘normal.’” 2018 WL 3008873, at *6. Even if

Dykman’s MRIs were stable,[6] Dr. Johnkutty does not address the medical literature that

“the progression of physical and cognitive disability in MS may occur in the absence of

clinical exacerbations,” which resembles Dykman’s progressing visual issues, fatigue,

and cognitive issues without an MS relapse. AR 500.

20. On top of the above issues with the medical review, at no point did LINA address

Dykman’s subjective complaints of disability or his mother’s statement documenting

how MS affected Dykman over the years. While this evidence would not be enough

alone to prove Dykman’s disability, LINA’s failure to address it weakens its argument.

*See Laurie v. United of Omaha Life Ins. Co.*, No. 3:14-CV-01937-YY, 2017 WL

975947, at *17 (D. Or. Jan 23, 2017), adopted by No. 3:14-CV-01937-YY, 2017 WL

970262 (D. Or. Mar 13, 2017) (criticizing the insurer for “discounting and ignoring [the

---

[6] Dr. Smoot wrote in a letter dated March 27, 2020 that Dykman’s MS had progressed such that the lesions that were at first only present in his brain were now also present in his thoracic spine, cervical spine, and left optic nerve. AR 3791. In an addendum, Dr. Johnkutty acknowledged Dr. Smoot’s letter but asserted that “there were no MRI reports provided with the letter,” and so “her opinion has not changed as there was no new medical evidence provided.” AR 5551. At the same time, in a previous addendum, Dr. Johnkutty had purported to have reviewed a document entitled “1/16/2020 John Shaw Note with references.” AR 5553. Dykman’s MRIs were included as an attachment to that letter and discussed in detail in the letter. AR 2300–20.

claimant's] subjective complaints" despite corroboration from physicians, colleagues, and friends). *See also Demer v. IBM Corp. LTD Plan*, 835 F.3d 893, 905 (9th Cir. 2016) (same); *Gorena*, 2018 WL 3008873, at *6 (noting, in support of a disability finding, that "the clinical reviews completely overlook [the claimant's] subjective reports of her symptoms (which lend further support to her assertions of disability due to MS), without stating any basis for questioning her credibility").

21. The Court finds that Dykman had proved by a preponderance of the evidence that he is disabled from his regular occupation and therefore entitled to LTD benefits under the plan for 24 months, from March, 7, 2019 to March 7, 2021.

22. LINA urges that we remand the case for a determination of benefits beyond March 7, 2021. ECF 22 at 14. LINA argues that two material changes warrant a remand. First, after twenty-four months of benefits are paid out, the Plan imposes a stricter "any occupation" standard for disability. Dykman must show that he is "unable to perform the material duties of any occupation for which [he] is, or may reasonably become, qualified based on education, training or experience" and "unable to earn 60% or more of [his] Indexed Earnings." *Id.* (citing AR 84). Second, "[o]nce 24 monthly Disability Benefits have been paid, no further benefits will be payable on the basis of [depression]." *Id.* (quoting AR 145) (second alteration in original).

23. This Court determines that a remand is appropriate for a benefits determination beyond March 7, 2021. Dykman argues that the Court should follow the path tread in *Gorena*, where, "[h]aving been satisfied that [the claimant] ha[d] proven her inability to discharge the material duties of her sedentary position . . . and established beyond question the lifelong and steadily deteriorating nature of her [MS], the [c]ourt clarifie[d]

[the claimant's] rights to future Plan benefits by finding that she is entitled to continuing LTD benefits under the 'any reasonable occupation' section of the Plan." 2018 WL 3008873, at *7.

24. *Gorena*, while helpful in several aspects of this case, is distinguishable because that claimant's MS manifested in "limitations concerning standing, sitting, walking, continence, cognitive abilities, and MS-related psychological/emotional disfunction." *Id*. This Court acknowledges that Dykman's job, like the claimant's job in *Gorena*, is sedentary and that sedentary work requires the least physical exertion of the occupational categories. *See* Soc. Sec. Ruling 83-10 ("Sedentary exertional demands are less than light, which are, in turn, less than medium."). This Court also recognizes that MS is a permanent disease. *See* AR 4611 ("At present, there is no cure for MS."). That said, Dykman's disability was limited—at least at the time of application—to visual issues, cognitive issues, and fatigue.

25. It may well be that Dykman's MS, or the symptoms related to it, have progressed or failed to resolve such that his treating physicians think he is now disabled from any sedentary occupation. For instance, Dr. Smoot said that, as of March 27, 2020, Dykman's "disabling MS symptoms plus his visual disorder continue to preclude him from performing not only his own occupation, but any type of occupation or work." AR 3791. Still, most of the evidence and briefing in this case has been directed at the question of whether Dykman was able to perform his then-current occupation. The Court is unwilling to make the inferential leap required to find that Dykman is disabled under the "any occupation" standard and will be for the duration of the plan. "Because the administrator has not had the opportunity to consider whether Plaintiff is disabled

under its definition for any gainful occupation, the Court agrees that remand is

appropriate." *Monroe v. Metro Life Ins. Co.*, No. 2:15-cv-02079-TLN0CKD, 2020 WL

1430005, at *27 (E.D. Cal. Mar. 24, 2020).   To show his eligibility for continuing

benefits on remand, Dykman has the burden of proving by a preponderance of the

evidence that he cannot earn 60% or more of his indexed earnings. AR 14. LINA can

attempt to show that he is able to work in a less visually-demanding job or that there has

been a material change to his condition—though Dr. Smoot said that "the prognosis is

guarded at best for any substantial improvement." AR 3791.

26. Although this Court remands based on the "any-occupation" provision, it clarifies that,

based on the existing record, LINA may not withhold Dykman's benefits because of

mental health. The record demonstrates that the conditions that are the basis for the

disability determination are due to physical problems, rather than psychological. First,

while Dykman has a history of depression, at no point have his physicians opined that

depression was the condition that disabled him. *See* AR 1302. Second, depression is a

common symptom of MS and there is evidence in the record that Dykman's mood was

worsened both by his MS and by work-related stress—including the stress of applying

for disability benefits. *See Gorena*, 2018 WL 3008873, at *7 (stating that "MS-related

psychological/emotional disfunction" was a symptom contributing to disability);

*Kitterman v. Standard Ins. Co.*, No. 09-CV-6294-TC, 2011 WL 1541310, at *3 (D. Or.

Apr. 21, 2011) ("[I]f plaintiff's migraines are a cause of his depression, the [mental

health] limitation does not apply and plaintiff is entitled to additional benefits."). Third,

and finally, LINA expressly excepts "Organic Brain Disease" from its mental health

limitations after the first two years of benefits. AR 145. The Plan does not define the

term "Organic Brain Disease," but the Court notes that lesions were found on Dykman's brain in 2011, when he was first diagnosed with MS. AR 834, 837

## CONCLUSION

The Court GRANTS IN PART and DENIES IN PART Dykman's motion for judgment under Fed. R. Civ. P. 52(a), ECF 20. The Court also GRANTS IN PART and DENIES IN PART LINA's cross-motion for judgment under Fed. R. Civ. P. 52(a), ECF 22. The Court DECLARES as follows: Dykman is entitled to LTD benefits under the Plan for the period from March 7, 2019 to March 7, 2021. The Court remands the case to the plan administrator for a determination of eligibility past that date consistent with this opinion.

**IT IS SO ORDERED**.

DATED this 8th day of November, 2021.

/s/ Karin J. Immergut
Karin J. Immergut
United States District Judge